**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

GRANT R. ELLSWORTH AND FERN
S. ELLSWORTH,

Plaintiffs- Appellees,

v.

WILLIAM J. TUTTLE, CHARLENE W.
TUTTLE, J. KENTON TUTTLE, AND
LORI M. TUTTLE,

Defendants-Appellants.

No. 03-4253
(D.C. No. 2:01-CV-907-K)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL** and **McWILLIAMS,** Circuit Judges, and **FRIOT,** District Judge.[**]

---

In this diversity action, Arizona citizens Grant and Fern Ellsworth sued Utah

citizens[1] William and Charlene Tuttle, and Kenton and Lori Tuttle, alleging fraudulent

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Stephen P. Friot, United States District Judge for the Western District of Oklahoma, sitting by designation.

[1] At argument, the court, *sua sponte*, noted the possibility of a jurisdictional question unresolved in the record and therefore called for supplemental briefs on the issues of standing and diversity of citizenship. After the supplemental briefs were filed, the court's analysis of the jurisdictional issue led to the conclusion that plaintiffs had

misrepresentation, breach of warranty, breach of contract, and conversion. Prior to trial, the breach of contract and conversion claims against Kenton and Lori Tuttle were dismissed. The matter was tried to a jury which returned verdicts against William and Charlene Tuttle on all four causes of action, and against Kenton and Lori Tuttle on the fraudulent misrepresentation claim. The jury awarded the Ellsworths $71,680 in compensatory and $10,000 in punitive damages against Kenton and Lori Tuttle for fraudulent misrepresentation. The jury awarded the Ellsworths $805,840 in compensatory damages and $150,000 in punitive damages against William and Charlene Tuttle on the fraud claims, as well as $125,000 for breach of warranty, separate awards of $14,500 and $7,500 for breach of contract, and $11,000 for conversion. The district court awarded the Ellsworths $212,578.75 in attorney fees. The Tuttles collectively appeal the fraud awards, arguing that (1) the fraud claims were not ripe; and that the district court erred when it (2) concluded that issues of fact concerning the Ellsworths' reasonable reliance precluded summary judgment, (3) permitted the Ellsworths' expert witnesses to testify regarding information contained in the water rights certificates, (4) permitted the Ellsworths' expert witness to testify regarding the value of "sole supply"and "supplemental supply" acreage, (5) prohibited the Tuttles from offering evidence of the Ellsworths' farming practices and

standing to assert their claims, but that the record should be supplemented, as authorized by 28 U.S.C. § 1653, with respect to certain jurisdictional facts which should have been established in the district court. The court entered an order requiring supplementation of the record. The record has been supplemented as required. Now that the record has been supplemented, diversity jurisdiction affirmatively appears from the record.

failure to mitigate, and (6) failed to remit the punitive damage awards. William and Charlene Tuttle separately appeal the breach of warranty, breach of contract, and conversion awards on the grounds that the district court erroneously (1) denied their motion for summary judgment with respect to the contract and conversion claims; (2) entered judgment awarding the Ellsworths a double recovery; and (3) awarded the Ellsworths attorneys' fees relating to non-compensable claims. We affirm.

**I. Factual Background.**

Because the jury found in their favor, we review the evidence in the light most favorable to the Ellsworths. *Woodworker's Supply, Inc., v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 988 (10th Cir. 1999). "[W]e accept the jury's factual determinations as long as they are reasonably based on some evidence or the inferences that may reasonably be drawn from such evidence." *Webb v. ABF Freight Sys. Inc.*, 155 F.3d 1230, 1234 n. 1 (10th Cir. 1998). Under this standard of review, the record establishes the following facts.

In 1998, Appellants William and Charlene Tuttle, and their son and daughter-in-law, Appellants Kenton and Lori Tuttle, decided to sell their farms in Millard County, Utah. William and Charlene Tuttle's farm consisted of twenty separate tracts of land totaling approximately 1,100 acres. Kenton and Lori Tuttle's farm comprised approximately 640 acres. In preparing to sell the properties, William Tuttle represented to his real estate listing agents that his farm included 1,057 acres of legally irrigated land. Its purchase price was set on that basis. Kenton Tuttle signed a listing agreement

representing that his farm included 502 acres of legally irrigated ground, and its purchase price was set accordingly.

Appellees, Arizona farmers Grant and Fern Ellsworth, learned of William and Charlene Tuttle's farm through Mr. Ellsworth's brother-in-law, Blaine Hunter, who happened to be one of the Tuttles' listing agents. The Ellsworths were interested in exchanging their Arizona property for other farmland as part of a tax-free, like-kind exchange, and arranged to view William and Charlene Tuttle's farm.

In August of 1998, Mr. Ellsworth traveled to Utah with his son David, and met for the first time with William Tuttle. In response to Mr. Ellsworth's questions as to the amount of water to which the farm was entitled and how water rights were determined, William Tuttle stated that the farm was entitled to four acre feet of water and had the capacity to produce that amount. He also stated that in the twenty-three years he had watered the farm, Utah's State Engineer had neither raised concerns with respect to the farm's irrigation, nor issued any notice that the farm was not in compliance with the watering restrictions.

Mr. Ellsworth was given a tour of the farm which at that time had approximately 1,057 acres under irrigation. To Mr. Ellsworth, the farm appeared to be well watered. He was also shown a large diesel-powered irrigation well on one of the parcels making up the farm. Just days prior to Mr. Ellsworth's visit, William and Charlene Tuttle had received a letter from the Utah State Engineer questioning the development and use of the diesel

well; the Tuttles never disclosed to the Ellsworths that there might be problems with the well. In fact, in the real estate purchase contract pertaining to their farm, William and Charlene Tuttle warranted that each well serving the property had the applicable permits, was in working order, and was fit for its intended purpose.

In October of 1998, Grant Ellsworth viewed Kenton and Lori Tuttle's farm. Irrigation pivots covered 502 acres of the farm and all 502 acres appeared to be watered. The Ellsworths offered to purchase the farms and shortly thereafter William Tuttle provided the Ellsworths with a computer printout of three, of what turned out to be a total of ten, state-issued certificates of appropriation pertaining to the irrigation of the two Tuttle farms. When Grant Ellsworth could not reconcile the certificates with the irrigated acreage, he asked William Tuttle for additional information. William Tuttle produced additional printouts and assured him that the farm had "plenty of water." William Tuttle also furnished a copy of a letter he had received in March of 1996 from the State Engineer. He explained that the letter, addressed "Dear Water User," provided verification of the farms' water rights.

On November 30, 1998, the parties entered into real estate purchase contracts pursuant to which the Ellsworths would pay $2,014,250 for William and Charlene Tuttle's farm and $850,000 for Kenton and Lori Tuttle's farm. The Ellsworths understood that they would receive the right to water the 1,057 irrigated acres of William and Charlene Tuttle's farm and the 502.4 irrigated acres of Kenton and Lori Tuttle's

farm. Shortly before the purchase of the farms was closed, the Tuttles demanded that the Ellsworths pay them seven percent interest on the difference between the farms' total purchase price and the approximately $750,000 in non-refundable payments the Ellsworths had already made. Although the real estate purchase contracts made no provision for such interest payments, on June 29, 1999, Grant Ellsworth and William and Kenton Tuttle signed a document providing that the Ellsworths would pay the Tuttles seven percent interest on the outstanding balance of the purchase price for the period of April 1, 1999 through June 29, 1999. That interest was to be paid from the proceeds of hay sales made before January 1, 2000.

The parties closed on the real estate purchase contracts on July 9, 1999. By letter dated December 6, 2000, Assistant State Engineer Terry Monroe informed the Ellsworths that the ten certificates of appropriation conveyed pursuant to the real estate purchase contracts provided for the irrigation of only 481.4 acres of William and Charlene Tuttle's farm and only 451.2 acres of Kenton and Lori Tuttle's farm. The letter further explained that the diesel irrigation well was not a legal point of diversion. These post-closing events precipitated some pre-suit correspondence between the parties. Unable to resolve the matter by agreement, the Ellsworths brought suit in the United States District Court for the Central Division of Utah. The Tuttles now seek review of the judgment on the jury verdicts in favor of the Ellsworths and of the related pretrial and post-judgment orders entered by the district court.

## II.  The Tuttles' assertions of error.

### A. Ripeness

The Tuttles assert that the Ellsworths' fraudulent misrepresentation and breach of warranty claims were not ripe for adjudication in the district court.  The ripeness doctrine requires the courts to decide only real and substantial controversies, rather than mere hypothetical questions.  *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297 (1979).  The doctrine is drawn not only from Article III limitations on judicial power, but also from the courts' prudential reasons for declining to exercise jurisdiction.  *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57, n. 18 (1993).  In the administrative law context, the doctrine prevents courts from entangling themselves in abstract disagreements over administrative policies and protects agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.  *Sierra Club v. U.S. Dept. Of Energy*, 287 F.3d 1256, 1267 (10th Cir. 2002).

In evaluating whether a claim is ripe for adjudication, the courts employ a threefold inquiry: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1231 (10th Cir. 2001) (quoting *Qwest Communications Int'l. Inc. v. F.C.C.*, 240 F.3d 886, 893-94 (10th Cir. 2001)). The

Tuttles assert that application of this test establishes that the Ellsworths' fraud claims are unripe. They assert that because neither the State Engineer nor any court had finally determined the water rights they conveyed to the Ellsworths to be less extensive than represented, the fraud and breach of warranty claims circumvented the administrative process, forcing the jury to speculate as to whether the Tuttles misrepresented those water rights.

At the heart of the Tuttles' argument is their contention that at the time they sold their farms to the Ellsworths, the water rights appurtenant to the farms were not conclusively established and that it was therefore impossible to determine whether representations made by the Tuttles regarding those rights were true. Thus, according to the Tuttles, before bringing their fraud and breach of warranty claims, the Ellsworths should have been required to have their newly purchased water rights adjudged invalid or insufficient either by initiation of an administrative action pursuant to Utah Admin. Code R 655-6-5, or by filing a declaratory judgment action against the State Engineer pursuant to Utah Code Ann. § 78-33-2. The Tuttles have offered no authority for this proposition, but reason that absent some sort of administrative or judicial pronouncement on the validity and scope of the certificates of appropriation, the certificates are of insufficient legal consequence to define the water rights conveyed by the Tuttles to the Ellsworths.

The Tuttles presented their ripeness argument to the district court first in the form of a motion in limine, and later in a motion for new trial. In both instances, the court

rejected the argument as being without merit. It observed that the Ellsworths' fraud claims do not turn on the validity of the certificates of appropriation, which is undisputed, but rather upon the Tuttles' alleged misrepresentations with regard to the number of acres permissibly watered under those certificates. The court found that the certificates definitively established the parameters of the water rights, and that experts for all parties agreed as to the water rights reflected in the certificates. The court further found that the State Engineer, by issuing the certificates, had done all that was required of him to establish the water rights appurtenant to the lands at issue, and that no further administrative action was required. Consequently, the court concluded that the Tuttles' alleged misrepresentations presented justiciable issues ripe for trial. We review the district court's finding of ripeness *de novo*. *Sierra Club*, 287 F.3d at 1263.

We agree with the district court that the certificates of appropriation established the extent of the water rights at issue with sufficient certainty to render the Ellsworths' fraud and breach of warranty claims ripe for trial. Certificates of appropriation are a critical component of Utah's complex water rights scheme and reflect the culmination of a lengthy, statutorily prescribed process. *See Little v. Greene & Weed Investment*, 839 P.2d 791, 794 (Utah 1992). Before the State Engineer issues a certificate of appropriation, a potential water user must file a detailed application containing information about the quantity of water to be used, the nature of the proposed use, and the source of the water. Utah Code Ann. §§ 73-3-1, 73-3-2. The State Engineer is required

-9-

to publish notice of the application, and interested parties may protest the application and appeal for review of its approval or denial. Utah Code Ann. §§ 73-3-6, 73-3-7, 73-3-14. If the State Engineer approves the application, the applicant is then authorized to attempt to divert the water and apply it to the approved beneficial use. Utah Code Ann. § 73-3-10. Only after the applicant has perfected his right by diversion and application of water to a beneficial use and submitted the required proofs does the State Engineer issue a certificate of appropriation. *Little,* 839 P.2d at 794; Utah Code Ann. 73-3-17. A certificate issued in accordance with this statutory scheme "shall be prima facie evidence of the owner's right to the use of the water in the quantity, for the purpose, at the place, and during the time specified therein, subject to prior rights." Utah Code Ann. § 73-3-17. Such a certificate constitutes the water user's deed of title, good against the state and anyone else who cannot show a superior right. R.L. Knuth, *Conveyancing and Collateralizing Utah Water Rights*, 12-DEC Utah B.J. 12 (1999); *Lake Shore Duck Club v. Lake View Duck Club*, 166 P. 309, 311 (Utah 1917). It is intended to be a final certificate of ownership, evidencing a vested right. *See Warren Irr. Co. v. Charlton*, 197 P. 1030 (Utah 1921). It is immune from collateral attack by one not a party to or interested in the proceeding which finally culminated in the issuance of the certificate. *Id*. at 1033.

Because the certificates of appropriation define the water rights conveyed, the Tuttles' alleged misrepresentation of those rights presented a ripe and justiciable issue.

Our conclusion is borne out by the fact that the Utah Supreme Court, in similar cases involving the conveyance of real property, has permitted the prosecution of fraud and mistake actions without requiring any separate preliminary proceeding to establish that the plaintiff received less acreage than that for which he bargained. *See, e.g., Dugan v. Jones*, 615 P.2d 1239, 12 45-46 (Utah 1980), *superseded by statute on procedural grounds*, *Arnold v. Curtis*, 846 P.2d 1307, 1309-10 (Utah 1993); *see also, Jensen v. Manila Corp.*, 565 P.2d 63 (Utah 1977) (awarding reformation of contract based on mutual mistake without requiring action to quiet title). The Tuttles seek to distinguish these cases on the basis that they involved disputes over land as opposed to water. In such cases, the Tuttles say, fraud claims became "ripe upon the sale of the land, which belonged to those involved in the purchase and sale, and the acreage of which was easily determined." (Reply Brief of Appellants, p. 3.) Water, they contend, must be treated differently because it is, by law, the property of the citizens of Utah. This argument misses the point. The Tuttles did not sell water to the Ellsworths, but water rights. Those rights, defined and regulated by the State of Utah under a comprehensive statutory scheme, are considered real property. Utah Code Ann. § 57-1-1(3); *In re Bear River Drainage Area*, 271 P.2d 846, 848 (Utah 1954). A duly issued certificate of appropriation constitutes a deed of title, *Lake Shore Duck Club* at 311, and land sale cases such as *Dugan* and *Jensen* are clearly relevant.

The Ellsworths' fraudulent misrepresentation claims did not present an abstract or

-11-

hypothetical disagreement. They became ripe when the Ellsworths paid in excess of

$2.86 million for what the Tuttles falsely represented to be over 1,559 acres of irrigated

farmland. The resultant injury to the Ellsworths could not have been addressed in any

administrative proceeding, and the facts on which the fraudulent misrepresentation claims

were based were fully developed at trial in the district court. We hold that the Ellsworths'

fraud claims were ripe for adjudication in the district court.

### B. Denial of Summary Judgment on Reasonable Reliance

The Tuttles next argue that the jury's fraud verdicts must be reversed because the

district court erred when it denied the Tuttles' motion for summary judgment, holding that

there were disputed issues of material fact with regard to the Ellsworths' fraud claim.

They maintain the facts were not in dispute, and that the Ellsworths' reliance upon their

representations as to the farms' irrigable acreage was unreasonable as a matter of law. As

the Ellsworths properly note, we are precluded from reviewing this alleged point of error.

It is well established that "the denial of a motion for summary judgment is not

reviewable on an appeal following the entry of final judgment after trial where the district

court's decision on the motion was based on its determination that there were genuine

issues of material fact in dispute." *Stump v. Gates*, 211 F.3d 527, 532, (10th Cir. 2000)

(citing *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1521). "[E]ven if

summary judgment was erroneously denied, the proper redress would not be through

appeal of that denial but through subsequent motions for judgment as a matter of law . . .

and appellate review if they were denied." *Wolfgang*, 111 F.3d at 1521 (quoting *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1251 (10ᵗʰ Cir. 1992), *cert. denied*, 507 U.S. 973 (1993)). The Tuttles suggest that they should be relieved from the operation of this rule because the record establishes that no facts were actually in dispute and the issue of reasonable reliance was a pure question of law. Once a trial court determines that genuine issues of fact are in dispute, however, we do not scrutinize the merits of that determination. *Stump*, 211 F.3d at 534.

Despite the Tuttles' attempt to define the question of reasonable reliance as an issue of law in this case, it is clear from the record that the district court denied their motion for summary judgment based on its determination that there were genuine issues of fact to be resolved at trial. To properly preserve the issue for appeal, the Tuttles were required to renew it at the close of all the evidence in a motion for judgment as a matter of law under Rule 50 (a)(1) of the Federal Rules of Civil Procedure. Having failed to so move, the Tuttles have waived the issue on appeal.

**C. Expert Testimony Regarding Water Rights**

The Tuttles assert that the district court erred in admitting expert testimony as to the "sufficiency and validity" of the water rights at issue in the case. Although framed in this instance as an evidentiary issue, this argument largely reprises their ripeness argument.

In their motion in limine to exclude testimony amounting to opinion testimony on

conclusions of law, the Tuttles argued that absent some preliminary adjudication of the subject water rights, expert witnesses could not properly testify as to the nature of the water rights sold by the Tuttles to the Ellsworths. As we have already determined, no prior adjudication of the subject water rights was required. The certificates of appropriation were the final statement of the Utah State Engineer. They constituted a deed of title and were immune from collateral attack. *See Warren Irr. Co.*, 197 P. at 1033; Utah Code Ann. § 73-3-17. The district court properly instructed the jury as to the legal status of the certificates. It found, however, that the language of the certificates was specialized, technical and unfamiliar to the ordinary juror. The court concluded that the testimony of experts having specialized training, experience and knowledge in the field of Utah water rights would help the jury understand the factual data contained in the certificates – a matter distinct from their legal import.

At trial, the Ellsworths introduced testimony from Utah Assistant State Engineer Terry Monroe and expert witness Michael Quealy identifying the parcels of land to which each certificate of appropriation was appurtenant, and specifying the number of acres to which water could be applied pursuant to each certificate. The Tuttles contend that admission of such testimony was an abuse of the district court's discretion as it encompassed legal determinations outside the scope of permissible expert testimony.

We review a trial court's decision to admit or exclude expert testimony for abuse of discretion. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000). We

will reverse only when that decision is "manifestly erroneous." *United States v. Simpson*, 7 F.3d 186, 188-89 (10th Cir. 1993). Moreover, erroneous admission of expert testimony that does not affect substantial rights and result in actual prejudice is deemed harmless and does not warrant reversal. *A.E. By and Through Evans v. Independent School District No. 25*, 936 F.2d 472, 476 (10th Cir. 1991). Applying this standard of review, we reject the Tuttles' assertions. A review of the record shows that neither the Ellsworths' expert witness Michael Quealy, nor State Engineer Terry Monroe simply told the jury "to reach a particular verdict based on his own say-so." *See United States v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005). Rather, both witnesses carefully explained the sources of their knowledge regarding the certificates of appropriation and summarized the factual information apparent to persons of their experience from the face of the certificates and the accompanying files. While both witnesses opined as to the amount of acreage that could be irrigated under each certificate, neither directly testified that the Tuttles' watering practices ran afoul of the irrigation limits, or that the Tuttles actually violated the law. Moreover, even testimony which "embraces an ultimate issue to be decided by the trier of fact" is allowed under the Federal Rules of Evidence, so long as the expert's testimony assists, rather than supplants, the jury's judgment. *Id.* at 1172; *see also* Fed. R. Evid. 704(a).

We find no abuse of discretion in the district court's determination that the jury would be assisted by expert testimony summarizing the certificates of appropriation. That

said, we also conclude that any error in admitting the testimony was harmless. The record shows that in the pretrial order, the parties stipulated to the facts relating to all certificates except the two numbered 67-137 and 67-286. Furthermore, in its order entered pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, the court found that the experts for all parties agreed as to the number of acres irrigable under those two disputed certificates. Finally, the Tuttles themselves elicited testimony from their expert as to the number of acres irrigable under certificates 67-137 and 67-286. His testimony was in accord with that given by the Ellsworths' witnesses.

The Tuttles complain that the district court's entry of the Rule 56(d) order was itself erroneous. That order, entered in conjunction with the court's denial of the Tuttles' motion for summary judgment, found that there was "no substantial controversy as to the fact that the experts in this litigation agree that water rights 67-137 and 67-286 provide for irrigation of the Tuttles' main farm in the amount of 309.9 acres in any given year." (Add. F to Brief of Appellants Kenton and Lori Tuttle). Under Rule 56(d), if a court finds that a motion for summary judgment should not be granted because genuine issues of material fact remain for trial, it may nonetheless enter an order that specifies those facts which appear to be without substantial controversy. *See Hampton v. Dillard Dept. Stores, Inc.*, 18 F.Supp.2d 1256, 1265-66 (D.Kan. 1998), *aff'd*, 247 F.3d 1091 (10th Cir. 2001). The primary purpose of Rule 56(d) is to salvage some result from the effort expended in the denial of a motion for summary judgment. *See City of Wichita v. U.S. Gypsum*, 828

F.Supp. 851, 869 (D.Kan. 1993) (citing 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2737 at 458-59 (2d ed. 1983)), *aff'd in part, rev'd in part on other grounds,* 72 F.3d 1491 (10th Cir 1996).  As with any grant of summary judgment, we review a grant of partial summary judgment under Rule 56(d) *de novo*, applying the same legal standard employed by the district court.  *See Timmons v. White*, 314 F.3d 1229, 1232 (10th Cir. 2003).   Thus we must determine whether the pleadings and evidence before the court, viewed in the light most favorable to the Tuttles, established that there were facts genuinely in dispute as to whether the parties' experts agreed on the number of acres that could be watered under certificates 67-137 and 67-286.  We find nothing in the record before the district court when it entered its Rule 56(d) order which would suggest the presence of a substantial controversy as to the expert's conclusions on this point.  In fact, the Tuttles do not deny that their own expert, like the Ellsworths' expert and the State Engineer, concluded that the certificates provided for the irrigation of 309.9 acres in any given year.  They merely argue that their expert's report also contained caveats indicating that the certificates and files pertaining to these water rights were confusing and might therefore, be susceptible to some other interpretation.  However, in its order, the district court explicitly ruled that the Tuttles were free to present evidence that they were unaware of the irrigation limitations, or that the irrigation limitations were difficult to ascertain. The Tuttles did, in fact, introduce testimony to that effect at trial.

While apparently conceding that their expert agreed that the certificates restricted

irrigation to 309.9 acres, the Tuttles challenge the procedural propriety of the district court's entry of a Rule 56(d) order. They argue that such orders are appropriate only where the summary judgment movant has been granted some portion of his requested relief and that here, the Tuttles' motion was denied. They further argue that the court was precluded from entering an order finding facts favorable to the Ellsworths because they did not move for summary judgment themselves. While it is true that a Rule 56(d) motion will not be entertained independent of a motion for summary judgment, *City of Wichita Kansas,* 828 F.Supp. at 869, nothing in Rule 56 makes the propriety of a Rule 56(d) order contingent upon granting the movant all or part of his requested relief. Nor do we find any support for the Tuttles' contention that a Rule 56(d) order may only function to establish those uncontroverted facts which favor the summary judgment movant. The district court's Rule 56(d) order provides no basis for reversal.

### D. "Sole Supply Acreage" versus "Irrigated Acreage"

The Tuttles next argue that the district court erred when it permitted the Ellsworths' appraisal expert Duane Price to testify, over their objection, on matters outside his expert witness report. Mr. Price was retained by the Ellsworths to establish the difference in value between acreage possessed of a valid and useable water right and acreage lacking such a valid and useable water right. In his report, Mr. Price noted that the farms at issue included at least three types of land: irrigated cropland, unirrigated cropable and pasture land, and a small amount of native dry grazing land. His report

focused on the difference between the value of the first type of land, which he characterized as "irrigated land," and the second type, which he characterized as "dry pastureland" or "land on which water may be removed." He concluded that as to the acreage sold by Kenton and Lori Tuttle, the difference in value between the two types of land was $1200 per acre. With regard to the property sold by William and Charlene Tuttle, the difference in value between the two types of land was $1400 per acre. The Tuttles collectively stipulated to $1400 per acre as the difference in value between an irrigated acre of land and a dry acre of land.

When called to testify at trial, Mr. Price embraced certain water law terminology that he had not employed in his report. In his trial testimony he used the term "sole-supply acreage" interchangeably with the term "irrigated land," and the term "supplemental supply acreage" interchangeably with the terms "dry pastureland" and "land on which water may be removed." The Tuttles assert that this expanded vocabulary amounted to a "radical" and undisclosed alteration of his expert opinion in violation of Rule 26(a) of the Federal Rules of Civil Procedure.

Where a party seeks to have evidence excluded on the basis of alleged discovery misconduct, "the challenged behavior must *substantially* have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Woodworker's Supply, Inc.*, 170 F.3d at 993 (emphasis in the original). The district court's ruling is reviewable only for abuse of discretion and will not be reversed unless

the court has made" an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id*. at 992 (quotation omitted). Even where the trial court finds a violation of Rule 26(a), the evidence is properly admitted if the violation was harmless or justified and the court "need not make explicit findings concerning the existence of a substantial justification or the harmlessness." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002).

The Tuttles complain that Duane Price's employment of the "sole supply" and "supplemental supply" terminology substantially interfered with their ability to prepare for trial because it falsely implied to the jury that Mr. Price was an expert in water law having particular knowledge of the water rights pertaining to the Tuttles' farms or the comparable farms he used to establish his valuations. They further argue that they were prejudiced by Mr. Price's altered terminology because his report comparing "irrigated cropland" with "unirrigated cropable land" or "dry pastureland" had led them to believe the Ellsworths' suffered no injury.

The Tuttles' argument is premised upon their contention that all of the land they sold to the Ellsworths was irrigated acreage because all the land had either an appurtenant water right or the potential to have water moved to it by way of a change application. This contention relies on the fact that under Utah's water rights scheme, certificates of appropriation frequently describe tracts of land containing considerably more acreage than can actually be watered under the certificates' irrigation restrictions. For example, a

certificate may describe, and thus become "appurtenant" to a 100 acre tract, while restrictions set forth in the certificate limit the amount of water that can be used in a given year to the irrigation requirements of only 60 acres of that tract. The parties agree that the 60 acres constitute "sole-supply acreage" and the remaining 40 acres constitute "supplemental supply acreage." According to the Tuttles' theory, however, the 40 supplemental supply acres, while not irrigable under the certificates in any given year, must nonetheless be considered "irrigated acreage" because they are described in a valid certificate. Therefore, the Tuttles conclude, the 40 "supplemental supply" acres are of equal value to the 60 "sole-supply" acres.

The Tuttles assert that they were unfairly surprised to learn that Mr. Price did not subscribe to their theory. The record does not support their suggestion that they were unaware that he distinguished the value of acreage readily irrigable under a useable water right from the value of acreage merely described in a water right but restricted from irrigation. Numerous pretrial documents showed clearly that the Ellsworths claimed that Kenton and Lori Tuttle sold them what was represented to be 502.4 acres of irrigated land when in fact, only 451.2 acres were irrigable under the certificates of appropriation transferred to them. The Ellsworths claimed that William and Charlene Tuttle sold them what was represented to be 1,057 acres of irrigated land when only 481.4 acres of were irrigable under the water rights transferred to them. It was on this basis that the Ellsworths claimed damages in the amount of $71,680 with respect to their purchase from

Kenton and Lori Tuttle, and $805,840 with respect to their purchase from William and Charlene Tuttle. These amounts represent the number of "unirrigated," or "dry," or "supplemental" acres multiplied by the $1,400 stipulated by the Tuttles to be the difference in value between an irrigated and a dry acre.

Any confusion the Tuttles entertained regarding Mr. Price's land valuations appears to be confusion they themselves manufactured. Moreover, the Tuttles were permitted to present to the jury their position supplemental water rights are "useable and valid water rights" and that they sold only irrigated acreage to the Ellsworths. They were permitted to challenge Mr. Price's conclusions and valuation methodologies, and to introduce the jury to their theory that sole supply acreage and supplemental supply acreage are of equal value. Indeed, they argued to the jury that Mr. Price's testimony proved that there should be no difference in value between sole supply and supplemental supply acreage. The jury's rejection of the Tuttles' argument does not suggest that the Tuttles were prejudiced by the terminology Mr. Price used in his trial testimony; it suggests rather that the jury believed that "land on which water may be removed," regardless whether it is called "cropable land," "dry pasture," or "supplemental supply acreage," was worth $1400 less per acre than land readily irrigable under the subject certificates of appropriation.

The district court did not abuse its discretion when it allowed Mr. Price to testify to the value of sole supply and supplemental supply acreage. The altered terminology did

not amount to a violation of Rule 26(a) because it did not affect in any material respect the information or conclusions contained in Mr. Price's report. Even if we were to assume that Mr. Price's testimony technically violated Rule 26(a), the district court acted well within its broad discretion in allowing it, as the violation was harmless. *See Jacobsen*, 287 F.3d at 953. In evaluating whether a Rule 26 (a) violation is harmless, the court considers: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc.*, 170 F.3d at 993. As discussed above, the Tuttles cannot plausibly claim to have been surprised by Mr. Price's testimony. The Ellsworth's position as to the number of acres lacking useable water rights and as to the difference in value between those acres and the acres having a useable water right was firmly established before trial. The Tuttles had ample opportunity to meet testimony supporting that position. Additionally, the Tuttles had the opportunity to cure any prejudice caused by Mr. Price's altered terminology by cross-examining him as to his understanding of the terms and the basis for their usage. It is also probable that the Tuttles would have learned that Mr. Price considered "irrigated acreage" to be synonymous with "sole supply acreage" had they chosen to depose him during the discovery process. The testimony caused no disruption of the trial because it was entirely consistent with the Ellsworths' pretrial declarations and the parties' stipulations. Finally,

the testimony will not support any suggestion of bad faith or willfulness on the part of the Ellsworths, who merely elicited testimony which conformed with the water law vocabulary to which the jurors were exposed throughout the trial.

### E. Preclusion of Evidence

#### 1. The Ellsworths' farming practices

The Tuttles appeal the district court's ruling on two motions in limine. They argue that the district court erred by excluding evidence relating to the Ellsworths' farming practices and non-mitigable damages and that they are consequently entitled to a new trial.

We review evidentiary exclusions for abuse of discretion, giving deference to the district court's rulings. *Cartier v. Jackson*, 59 F.3d 1046, 1048 (10th Cir. 1995). A court's evidentiary rulings will be reversed only where they "resulted in manifest injustice" to the parties. *Thompson v. State Farm Fire & Cas. Co*, 34 F.3d 932, 939 (10th Cir. 1994). The burden of demonstrating manifest injustice rests with the party asserting error. *United States v. Mitchell*, 113 F.3d 1528, 1532 (10th Cir. 1997). Furthermore, where the verdict "more probably than not was untainted by the error, the error is harmless and a new trial is not required." *U.S. Industries v. Touche, Ross & Co.*, 854 F.2d 1223, 1259 n. 53 (10th Cir. 1988) *overruled on other grounds as recognized by Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996).

The Tuttles argue that they should have been permitted to introduce evidence

showing that the Ellsworths have consistently watered parcels alleged to be without useable water rights, as well as evidence that they have replaced fields of alfalfa with other crops and have failed to properly care for crops. They claim that such evidence was relevant to the amount of damages their misrepresentations caused the Ellsworths to suffer. In support of this argument the Tuttles argue, as they have argued throughout this appeal, that the Ellsworths' "entire case was premised on their claim that a letter from an assistant regional state engineer precluded them from irrigating the property they purchased from [the] Tuttles." (Reply Brief of Appellants at 13). This is a fundamental mischaracterization of the nature of the Ellsworths' claims. The Ellsworth's claims for fraud and misrepresentation are based upon the Tuttles' overstatement of their farms' water rights. In granting the Ellsworths' motion in limine, the district court stated:

> The evidence serves no relevant purpose and has no probative value with respect to [the Ellsworths'] damages claim for misrepresentation and/or fraud regarding the alleged shortfall of water rights in the purchase of the farm. Plaintiffs are seeking only the difference in land price associated with an irrigated acre versus a dry acre.
>
> . . .
>
> Moreover, evidence that [the Ellsworths are] watering a different parcel without a change application is more prejudicial than probative. This evidence has no relation in time to the purchase of the farm or the difference in value between an irrigated acre and a dry acre of property. Even if [the Ellsworths] had been watering parcels of land that have no water rights, it has no bearing on the value of the land. The parcels have no water rights. Therefore, the only purpose of he evidence would be to paint [the Ellsworths] in an unfavorable light. The evidence would confuse and prejudice the jury and is, therefore, inadmissible.

> Aplt. App. 1555.

-25-

The district court's exclusion of evidence relating to the Ellsworths' farming practices after purchase of the farms was well within the court's discretion and will not be disturbed.

### 2. Mitigation of damages

#### a. Equitable estoppel

The Tuttles also claim that the district court erroneously granted the Ellsworths' Motion in Limine to Exclude Evidence of Non-Mitigable Damages. They contend that the district court's order prevented them from showing that the Ellsworths could have mitigated their damages had they appealed the state engineer's determinations regarding their certificated water rights, filed a change application, or pursued an equitable estoppel claim against the State. A review of the court's order, however, reveals that it excluded only evidence relating to the Tuttles' equitable estoppel argument and to any argument that Ellsworths might, by filing a due diligence claim, acquire rights to water possibly put to use on the farms before1935 when the current appropriation scheme was enacted. The court explicitly denied the Ellsworths' motion to the extent it sought exclusion of evidence pertaining to change applications, and although the Ellsworths motion did not even address the subject, the court nonetheless assured the Tuttles that it did not intend to preclude evidence as to whether the Ellsworths should have appealed the State Engineer's determinations.

The Tuttles insist that the court erroneously excluded evidence suggesting that the

Ellsworths could have successfully challenged the State Engineer on equitable estoppel grounds. They allege that they and the Ellsworths relied upon a 1996 form letter sent by the State Engineer to area water users, including the Tuttles. That letter stated: "[d]uring the spring of 1994, the acreage survey was completed and all water users who were irrigating land without a water right were notified. As a result of this effort and with the cooperation of water users, all irrigated lands are now covered by valid water rights." The Tuttles maintain that this letter, addressed "Dear Water User," constitutes a "solemn written commitment" which estops the State Engineer from interfering with water usage established at that time. They further contend that the Ellsworths had a legal duty to pursue an estoppel claim in order to mitigate any damage caused by the Tuttles' transfer of insufficient certificated water rights.

The Ellsworths respond that the potential for success of an estoppel claim against the State Engineer was so unlikely as to make such a suit an unfit basis for the mitigation of their damages. They contend that any estoppel claim was doomed because they could not responsibly allege that the Tuttles reasonably relied upon the "Dear Water User" letter. Under Utah law, a claim for equitable estoppel requires proof of: (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) Reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act, or failure to act; and (3) Injury to the second party that would result from allowing the first party to contradict or repudiate such statement,

admission, act, or failure to act. *Nunley v. Westates Casing Services, Inc.*, 989 P.2d 1077, 1088 (Utah 1999). The Ellsworths allege that the Tuttles never acted in reliance upon the form letter, but merely continued the improper irrigation practices they had engaged in for years. They maintain that any potential claim for estoppel belonged only to the Tuttles, and they should not be required to engage in quixotic litigation after having paid in excess of $2.85 million for what was represented to be well over 1500 acres of irrigated farm land.

After careful consideration of the parties' arguments, the district court found that the Tuttles had failed to meet their burden of establishing a mitigation defense grounded on an equitable estoppel theory. Mitigation is an affirmative defense that requires the Tuttles to prove with reasonable certainty the amounts by which the Ellsworths' damages could have been mitigated. *Pratt v. Board of Educ*ation *of Vintah Co. School Dist*., 564 P.2d 294, 297-98 (Utah 1977). Just as speculative damages may not be awarded, the duty to mitigate does not apply when the proposed mitigation is too speculative. *Double D. Amusement Co. v. Hawkins,* 438 P.2d 811-12 (Utah 1968). Furthermore, there is no duty to mitigate when it would require "time, energy and expense to do a possibly useless thing." *Id*. at 812. The district court determined that the Tuttles' proposed mitigation requiring the Ellsworths to successfully prosecute an equitable estoppel claim against the state, was too speculative to be presented to the jury. The Tuttles have failed to show that this amounted to an abuse of discretion resulting in manifest injustice.

### b. Diligence claims

It is not clear whether the Tuttles also appeal the district court's exclusion of evidence related to their theory that the Ellsworths had a duty to pursue a claim for appropriation of water that may have been claimed or put to use prior to the enactment of Utah's modern water legislation in 1935. The court noted that the Tuttles, during their long tenure of ownership of the farms, had never pursued such a claim, and that there was consequently no diligence claim appurtenant to the property when the sale of the farms took place. The court further found that the Tuttles had introduced no evidence that could support such a theory. In granting the Ellsworths' motion in limine the court stated: "Because Defendants have not provided some evidence that would support a diligence claim, they should not be allowed to give an inference to the jury that [such a claim] should have been pursued as mitigation." Aplt. App. 2092). The Tuttles have pointed to nothing in the record to suggest the district court overlooked evidence which would have supported a mitigation defense based upon the pursuit of a due diligence claim. Therefore, the district court did not abuse its discretion by precluding the Tuttles from presenting to the jury an unfounded inference.

### c. Change applications

Contrary to the Tuttles' contentions, the record shows that they were indeed permitted to introduce evidence that the Ellsworths could have filed change applications in an effort to transfer water rights to the farms. In the course of presenting that evidence,

however, they attempted to elicit expert testimony as to the likelihood that such applications would be granted. The Ellsworths objected to the question on the ground that it called for speculation. The Ellsworths also drew the court's attention to the fact that it had previously sustained the Tuttles' objection that the Ellsworths' questioning of Assistant State Engineer Terry Monroe called for him to speculate as to whether a change application would likely be rejected. The court likewise sustained the Ellsworths' objection on the ground that testimony as to whether a particular application would be rejected was impermissibly speculative. The court allowed evidence and arguments that a change application could easily be filed, that the State Engineer had recommended that the Ellsworths file a particular change application, and that "most" change applications are approved. Moreover, the Tuttles' expert was permitted to testify as to what lands would be irrigable if a change application were to be successfully prosecuted.

The district court did not abuse its discretion by consistently excluding speculative testimony as to whether a particular application would be granted or denied. The district court's rulings on both motions in limine are affirmed.

### F. Punitive damages

The jury awarded $805,840 in compensatory damages for fraud and $150,000 in punitive damages against William and Charlene Tuttle and $71,680 in compensatory damages for fraud and $10,000 in punitive damages against Kenton and Lori Tuttle. As the Ellsworths point out, this amounts to a punitive versus compensatory damages ratio of

approximately .18:1 in the case of William and Charlene Tuttle, and a punitive versus compensatory damages ratio of approximately .13:1 in the case of Kenton and Lori Tuttle.

The Tuttles filed a motion for new trial or, in the alternative for complete remittitur of the punitive damage awards on the ground that the punitive damage awards were excessive and not supported by Utah law. The Tuttles point out that under Utah law, when deciding upon or reviewing an award of punitive damages, a jury or court is to consider: (1) the relative wealth of the defendant; (2) the nature of the alleged misconduct; (3) the facts and circumstances surrounding such conduct; (4) the effect thereof on the lives of the plaintiff and others; (5) the probability of future recurrence of the misconduct; (6) the relationship of the parties; and (7) the amount of actual damages awarded. *Diversified Holdings, L.C. v. Turner*, 63 P.3d 686, 694 (Utah 2002) (citing *Crookston v. Fire Ins. Exchange*., 817 P.2d 789 (Utah 1991)). While the Tuttles argued that none of these factors support the punitive damage awards in this case, they particularly complained that no evidence was introduced at trial as to the Tuttles' relative wealth. The Tuttles argued that all seven factors must be considered and that absence of evidence relating to even a single factor was fatal.

The district court denied the Tuttles' motion on four grounds: (1) the Tuttles waived arguments relating to the jury's alleged failure to consider the *Crookston* factors because they neither proposed a jury instruction setting forth the factors, nor objected to the instruction given on those grounds; (2) failure to instruct the jury with regard to the

*Crookston* factors was not error;  (3) the punitive damage awards were not excessive; and

(4) there was sufficient evidence of the parties' relative wealth to support the verdicts.

The Tuttles contend that the district court's denial of their motion on these grounds was

error.

The Tuttles have advanced no federal constitutional challenge to the punitive

damage awards, and perhaps understandably so, in light of the very substantial

differences between the ratios in the case at bar and the ratios which have been involved

in the Supreme Court's recent cases addressing the constitutional limitations on punitive

damage awards, prominent among which is *State Farm Mut. Auto Ins. Co. v. Campbell*,

538 U.S. 408 (2003), also a Utah case.  Consequently, in this diversity case, our scrutiny

of the punitive damage awards is based – as are the Tuttles' arguments – entirely on state

law.  *Mason v. Oklahoma Turnpike Authority*, 182 F.2d 1212,1214 (10th Cir. 1999).  We

review the district court's determinations as to excessiveness for abuse of discretion.

*United Intern. Holdings, Inc. v. Wharf (Holdings) Limited*, 210 F.3d 1207, 1232 (10th Cir.

2000);  *Mason*, 182 F.3d at 1214.  Where a motion for new trial asserts that the jury's

verdict is not supported by the evidence, the court considers the evidence in the light most

favorable to the prevailing party and allows the verdict to stand unless it is clearly against

the weight of evidence. *See Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir.

1999).

We note at the outset the Tuttles' apparent misapprehension of the district court's

-32-

rulings with regard to jury instructions. Contrary to the Tuttles' assertions, the district court did not conclude "that the Tuttles could not bring a post-trial motion for new trial when they did not request an instruction that included the *Crookston* factors." (Brief of Appellants Kenton and Lori Tuttle, p. 55.) Rather, the court concluded that the Tuttles were not entitled to prevail upon such a motion on the basis that the *jury* did not consider those factors. The record shows that the Tuttles did not properly preserve for appeal issues relating to how the jury was instructed regarding punitive damages. The court's denial of the motion on those grounds was consistent with Rule 51 of the Federal Rules of Civil Procedure and was not error.

The Tuttles also contend that the court erred when it found, without having first applied the *Crookston* factors, that the jury's punitive damage awards were not excessive. The Tuttles insist that Utah law mandates application of all seven factors each and every time a court reviews an award of punitive damages. However, the very Utah Supreme Court case on which they base their argument undermines this contention. In *Diversified Holdings*, the Utah Supreme Court reiterated that where an award of punitive damages falls within accepted ratios, the trial court may assume that the award is not excessive and allow it to stand without offering any detailed explanation for its decision. *Diversified Holdings*, at 700. In Utah jurisprudence, accepted ratios for punitive damage awards under $100,000 are 3:1 or less. Accepted ratios for punitive damage awards in excess of $100,000, the accepted ratios are 2:1 or less. *Id.* at 697; *Crookston*, 817 P.2d at 810. The

punitive damages awarded in this case easily fall within the ratios accepted in Utah as presumptively reasonable.

Because the punitive damage awards were presumptively reasonable, the court could have, consistent with Utah law, sustained the them without any reference to the *Crookston* factors. Instead, it noted the applicability of the factors and proceeded to determine that there was sufficient evidence presented at trial to sustain the verdicts in light of all seven factors, including the relative wealth of the Tuttles. Thus, we cannot conclude that the court did not consider each of the *Crookston* factors when it determined that the awards were "clearly not excessive." The district court did not abuse its discretion in determining that the jury's awards of punitive damages were reasonable under Utah law.

Finally, the Tuttles assertion that under Utah law a plaintiff's failure to provide evidence of relative wealth "*requires*" the court to reverse or remit a punitive damage award is simply incorrect. Although the Tuttles attempt to distinguish the case as applying only to motions for judgment notwithstanding the verdict based on insufficient evidence, *Hall v. Wal-Mart Stores, Inc*., 959 P.2d 109 (Utah 1998) speaks for itself. In that case the court plainly states: "While evidence of the defendant's wealth is a relevant factor in the award of punitive damages, it is not a necessary factor. The plaintiff is not required to introduce evidence of a defendant's relative wealth, but would be wise to do so, as under *Crookston I*, an award which is presumptively excessive and might otherwise

-34-

be struck down, can be justified by the defendant's relative wealth." *Id*. at 113. The district court did not abuse its discretion when it upheld the jury's award of punitive damages.

### G. Denial of Summary Judgment on Contract and Conversion Claims

In addition to their claims for fraud and misrepresentation, the Ellsworths brought claims against William and Charlene Tuttle for breach of contract and conversion. The Ellsworths claimed that William and Charlene Tuttle improperly collected over $18,000 under the real estate purchase contract for their farm by mischaracterizing mortgage interest payments as contractually reimbursable expenses incurred in connection with the 1999 crop. They further claimed that William and Charlene Tuttle improperly collected approximately $14,000 in interest on the outstanding balance of the purchase price of the farm pursuant to a separate agreement dated June 29, 1999. According to the Ellsworths, that agreement, if valid, provided that interest would be payable only from the proceeds of the 1999 hay crop. The Ellsworths contend that the word "proceeds" was understood to mean "profits" and because there was no profit, no interest payment was due.

Prior to trial, William and Charlene Tuttle moved for summary judgment on the contract and conversion claims, asserting that the plain language of both agreements showed they were entitled to the payment they received. The court denied the motion, finding that there were genuine issues of material fact concerning both the real estate purchase contract and the June 29, 1999 agreement. William and Charlene Tuttle appeal

the denial of their motion, asserting that the facts were not in dispute and that they were entitled to judgment as a matter of law. As discussed in section B, above, however, "the denial of a motion for summary judgment is not reviewable on an appeal following the entry of final judgement after trial where the district court's decision on the motion was based on its determination that there were genuine issues of material fact in dispute." *Stump*, 211 F.3d at 532. Having failed to preserve these issues by filing a motion for judgment as a matter of law pursuant to Rule 50(a)(1), the Tuttles have waived this ground for appeal.[2]

**H. Double Recovery**

Over their objection, the district court entered judgment against William and Charlene Tuttle in the amount of $1,113,840. This total includes four separate damage awards found in the special verdict form: (1) $805,840 for fraud; (2) $125,000 for breach of warranty; (3) $11,000 for wrongful conversion; and (4) $14,500 for breach of contract damages attributable to removal of funds from the 1999 farm operating account for payment of the additional seven percent interest. Although the Tuttles did not object

---

[2]In addition to finding that there were genuinely disputed issues of material fact regarding the June 29, 1999 agreement, the court further found that the term "proceeds," as used in the agreement, was ambiguous and called for the consideration of parol evidence at trial. The Tuttles are correct that the court's finding of ambiguity constitutes a legal conclusion and that they were not required to move for a judgment as a matter of law to preserve the issue for appeal. However, in light of the jury's determination that the June 29, 1999 agreement lacked consideration and was not a valid contract, any question of ambiguity has been rendered moot.

to the verdict prior to dismissal of the jury, they later brought a Rule 49 (b) motion for new trial alleging that the awards were inconsistent. The district court denied the motion, finding that the jury verdict did not demonstrate any confusion or inconsistency. The court also found that the Tuttles had waived any claim of inconsistency by failing to timely object. (Add. G to Brief of Appellants William and Charlene Tuttle.) The Tuttles subsequently filed a motion for new trial pursuant to Rule 59(e), or in the alternative, to alter or amend the judgment, arguing that the fraud and breach of warranty awards were duplicative, as were the conversion and breach of contract awards. The court denied the motion, noting the great deference due a jury verdict and finding that the jury's awards were not outside the range of evidence so as to exceed a reasonable effort to compensate the Ellsworths for their injury. It determined the Tuttles had not met their heavy burden of demonstrating that the verdicts were overwhelmingly against the weight of evidence. (Add. H to Brief of William and Charlene Tuttle, citing *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998).)

On appeal, the Tuttles argue that the denial of their motion was erroneous. They request that the judgment be reversed and remanded with instructions to the district court to reduce the judgment so as to eliminate any double recovery. In reviewing a district court's ruling on a motion for new trial, we do not make a determination of the sufficiency or weight of evidence, rather our review is limited to whether the district court's refusal to set aside the verdict was a manifest abuse of discretion. *Id*. at 1235.

Thus, the denial of a motion for new trial or remittitur on grounds of excessiveness will not be disturbed on appeal absent a gross abuse of discretion. *United Intern. Holdings, Inc.,* 210 F.3d at 1229. Because the question of whether awards are duplicative is one of fact, we will uphold a trial court's conclusion that there has been no duplication of damages unless it has no rational basis in the evidence. *See, U.S. Industries,* 854 F.2d at 1259 n. 53; *see also, Mann v. Reynolds*, 46 F.3d 1055, 1062 (10th Cir. 1995).

As to the alleged duplication of fraud and breach of warranty awards, William and Charlene Tuttle argue principally that the awards are inconsistent with the Ellsworths' established theory of damages. Throughout the litigation, the Ellsworths asserted their measure of damages on both claims to be the difference between the value of the land with a valid and useable water right, and the value of the land without such a valid and useable water right. The jury determined that the Ellsworths had bargained for 575.6 more acres of irrigable land than they received. Applying the $1,400 per acre that the parties stipulated to be the difference in value between land with and without a useable water right, the jury awarded $805,840 in fraud damages against William and Charlene Tuttle. Because the jury's fraud award fully compensated the Ellsworths for the diminished value of the land, the Tuttles contend that the $125,000 awarded for breach of warranty must be duplicative of the fraud award. However, the court will not undermine a jury verdict by speculating as to how an award must have been reached. *Mid-West Underground Storage, Inc. v. Porter*, 717 F.2d 493, 501-02 (10th Cir. 1983). Moreover,

the jury was not constrained to accept the Ellsworths' theory of damages on the breach of warranty claim. *See, Shugart v. Central Rural Elec. Co-op*, 110 F.3d 1501, 1506 (10th Cir. 1997). As the district court observed in its order denying the motion, "[t]he jury was instructed to award damages for any injury proximately caused by Defendants' breach of warranty and the jury was not limited to the same measure of damages for the fraud and breach of warranty claims." (Add. H to Brief of Appellants William and Charlene Tuttle.)

On the breach of warranty claim, the jury determined that the diesel irrigation well could not be used for its intended purpose as warranted. It heard evidence that the well, with its new motor, cost $100,000 to develop. It also heard evidence that obtaining the necessary permits to operate the well would entail an expensive contested process that could cost tens of thousands of dollars. The Ellsworths suggest such evidence could support the jury's conclusion that the well itself, apart from the parcel on which it was drilled, was worth $125,000 as warranted and that the Tuttles' breach of warranty therefore damaged the Ellsworths in that amount. It was the Tuttles' burden to demonstrate that the value of the diesel well was subsumed in the diminished value of the land they sold to the Ellsworths. The trial court necessarily determined that burden was not met, and we cannot conclude that finding was without a rational basis in the evidence the court considered.

As to the asserted duplication of conversion and breach of contract awards, the Tuttles argue that the jury found they removed only $14,000 from the 1999 farm account as payment of the seven percent interest purportedly due on the balance of their farm's purchase price. It nonetheless awarded $14,500 on the breach of contract claim and $11,000 for conversion of those same funds. The Tuttles contend this is clear evidence that the jury's breach of contract and conversion awards are duplicative. The Ellsworths maintain there was evidence in the record to support conversion damages relating to moneys withdrawn by the Tuttles for payment of separate mortgage interest under the real estate purchase contract. They suggest that the jury's combined awards for breach of contract and conversion damages, amounting to $33,000, are consistent with the evidence establishing that the Tuttles improperly deducted a total of approximately $32,000 from the 1999 farm account. They also point out that the Tuttles failed to object to the verdict forms on the basis that they could lead to a double recovery. Furthermore, the Tuttles stipulated to the conversion instruction given the jury, and they actually proposed the breach of contract instruction that was used. Neither instruction advised the jury that an award on one cause of action precluded recovery on the other, and neither instruction cautioned the jury against duplicative awards. Thus, by way of instructions which the Tuttles are precluded from challenging on appeal, the jury was thus given broad discretion in fashioning a remedy.

The district court found that, considering all the evidence adduced at trial, the awards did not exceed a reasonable attempt by the jury to compensate the Ellsworths for the full extent of their loss. Because there was some reasonable basis in the evidence to support the jury's award, we are unwilling to find the district court's denial of the Tuttles' motion to alter or amend the judgment to constitutes a gross abuse of its discretion.[3] The court's denial of the motion was not erroneous.

## I. Attorney Fees

At the conclusion of the trial, the Ellsworths applied for attorneys' fees on the basis that their real estate purchase contract with William and Charlene Tuttle provided "[i]n the event of litigation . . . to enforce this Contract, the prevailing party shall be entitled to costs and reasonable attorney fees." William and Charlene Tuttle objected on several grounds including the one which underlies this appeal: that the Ellsworths failed to properly distinguish the fees incurred in proving the contract claims from those incurred in proving the fraud claims. The district court rejected the Tuttles' argument. It found that the Ellsworths, whose counsel had divided contemporaneous billings into twenty-two separate categories, had indeed "provided sufficient detail of the nature of the work for the court to conclude that the requested amount of time was expended in an efficient manner and on the claims related to the [real estate purchase contract]." Aplt.

---

[3]While the brief submitted by William and Charlene Tuttle is ambiguous at best with regard to whether they seek a new trial, we take at face value the representation in their Reply Brief that they seek only amendment of the judgment.

App. 3299). The court, therefore, awarded the Ellsworths attorneys' fees in the amount of $212,578.75. William and Charlene Tuttle contend the award constitutes an abuse of the court's discretion.

We review an award of attorneys' fees for abuse of discretion and "will hold the underlying findings of fact reversible only if they are clearly erroneous." *Mann v. Reynolds*, 46 F.3d at 1062. The district court is in the best position to evaluate the facts at issue, and its findings will be upheld unless "there is no rational basis in evidence for the ruling." *Id.* at 1062-63. "Where the contracting parties have agreed that a breaching party will be liable for attorneys' fees, the purpose of the award is to give the parties the benefit of that bargain, and the court's responsibility is to enforce that bargain." *United States v. Western States Mechanical Contractors, Inc*., 834 F.2d 1533, 1548 (10th Cir. 1987). Courts do not possess the same degree of discretion to deny contractual attorneys' fees as they have when applying a statute providing for a discretionary award. *Id*. at 1549. Rather, the role of the trial court is to "determine if the claimed fees are inequitable or unreasonable." *Id*.

In this case, the Ellsworths pursued three causes of action arising out of the real estate purchase contract: a breach of warranty claim related to the diesel well, and two breach of contract claims related to expenses and interest improperly paid from the 1999 farm operating account. They were successful on all three claims. The Ellsworths also

successfully pursued a fraud claim based upon the Tuttles' misrepresentation of their farms' water rights.

A review of the record shows that the Ellsworths did not seek to recover fees incurred exclusively in the pursuit of their fraud claim. Their counsel eliminated from the attorneys' fee application 481.5 hours of attorney time and 15.25 hours of paralegal/clerk time because it was primarily attributable to the fraud claim. Although many of the hours set forth in the application were spent developing facts and evidence which related to both the fraud and contract claims, the district court found that the claims shared essentially the same set of core facts. Where fee-bearing and non-fee bearing claims are based on essentially the same core set of facts, the fact that one of the theories will not support fee shifting (or is not successfully prosecuted) does not defeat recovery of fees where the party seeking recovery of fees prevails on the fee-bearing theory. *Ramos v. Lamm*, 713 F.2d 546, 556 (10th Cir. 1983). Plaintiffs' action should not be viewed as a series of discrete claims. *Sinajini v. United States*, 233 F.3d 1236, 1243 (10th Cir. 2000). The court's focus is on the significance of the overall relief obtained in relation to the hours reasonably expended on the litigation. *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)).

William and Charlene Tuttle argue that in this case, the breach of warranty and fraud claims are substantially distinguishable. They note that the elements of the two claims differ appreciably, and contend that to recover attorneys' fees, the Ellsworths were

required to distinguish between work done that was subject to a fee award and work that was not. They claim that the only overlapping facts and evidence related specifically to the diesel irrigation well and the parcels it watered. The Tuttles' strategy throughout the trial and appeal of this matter, however, has been to argue that the water rights, including those appurtenant to the parcels watered by the diesel well, were so ill-defined as to defy ascertainment short of a separate preliminary administrative or judicial action. Absent some administrative or judicial declaration of the scope of each certificate of appropriation, they argued, it was impossible to determine the amount of water to which any particular parcel was entitled, or the amount of water any particular well was authorized to produce. This position forced the Ellsworths to develop a detailed analysis of the historical development of all the water rights pertaining to the farms. Because they shared a common core of facts, that analysis related to both the breach of warranty and fraud claims.

We do not agree with William and Charlene's assertion that recovery of fees with respect to overlapping contract and tort claims is permissible only when the underlying facts are "identical." Where the facts underlying the fee-bearing claim are essentially indistinguishable from the facts underlying the non-fee bearing claim, neither allocation nor denial of a fee recovery is required (although, as we have noted, the Ellsworths' counsel did eliminate several hundred hours of services which were identifiable as being primarily attributable to the fraud claim). The district court, having become intimately

familiar with the facts of this case, determined that the "fraud claim [was] based on essentially the same set of core facts as the breach of warranty claim," Aplt. App. 3298, and was well-satisfied with both the allocation and the billing judgment which was applied by the Ellsworths' counsel. *Id.* Having no basis upon which to conclude that those determinations were clearly erroneous, we affirm the district court's award of attorneys' fees.

The judgment of the district court is affirmed.

Entered for the Court


Stephen P. Friot
District Judge