**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 1 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

SARA STUMP; SYLVIE OCRANT, as
Executrix of the Estate of Andrew M.
Ocrant,

      Plaintiffs - Appellees and
      Cross-Appellants,

v.

DARYL G. GATES, individually and in his
official capacity as former Chief of Police
of the Greenwood Village Police
Department; DIANE J. SEXTON,
individually and in her official capacity as
Detective of the Greenwood Village Police
Department,

      Defendants - Cross-Appellees,

CITY OF GREENWOOD VILLAGE, a
municipality,

      Defendant - Appellant
      and Cross-Appellee,

and

JILL GOULD, Dr., in her official capacity
as Coroner of the Arapahoe County
Coroner's Office; ARAPAHOE COUNTY
CORONER'S OFFICE; ARAPAHOE
COUNTY BOARD OF COUNTY
COMMISSIONERS; SUEANN OCRANT;
WILLIAM KOHNKE, in his official

Nos. 98-1249 & 98-1267

capacity as Chief of Police of the Greenwood Village Police Department, a local government authority; ROLLIN BARNARD, in his official capacity as Mayor of the City of Greenwood Village, a municipality; GREENWOOD VILLAGE POLICE DEPARTMENT, a local government authority,

Defendants.

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 91-D-509)**

---

Andrew J. Carafelli, Halaby Cross & Schluter, Denver, Colorado, (Theodore S. Halaby, E. James Wilder of Halaby Cross & Schluter, Denver, Colorado, and Herbert C. Phillips of Hayes, Phillips & Maloney, P.C., Denver, Colorado, with him on the briefs) for Defendant-Appellant and Cross-Appellee City of Greenwood Village.

W. Daniel Mahoney, Schlueter, Mahoney & Ross, P.C., Denver, Colorado, (Marcella T. Clark, Attorney, Denver, Colorado with him on the briefs) for Plaintiffs-Appellees and Cross-Appellants.

---

Before **KELLY**, **ALARCÓN**,[*] and **HENRY**, Circuit Judges.

---

**ALARCÓN**, Circuit Judge.

---

[*] The Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

Sara Stump and Andrew M. Ocrant ("Plaintiffs") filed this action in the district court seeking damages for violation of their federal rights pursuant to 42 U.S.C. § 1983, and for civil conspiracy and outrageous conduct under Colorado law.[1]

The City of Greenwood Village ("City") seeks reversal on discrete grounds.[2] The City asserts that the district court erred in denying its motion for summary judgment. We hold that this issue is not reviewable because a final judgment was entered following a jury trial. The City also contends that the district court committed prejudicial error in admitting a grand jury report over objection. We vacate the judgment and remand because we conclude that the district court abused its discretion in permitting the jury to read the grand jury's report.

The City argues that the damages awarded by the jury are duplicative. In their cross-appeal, the Plaintiffs maintain that the district court erred in ruling that the compensatory damage award was several rather than joint. Our decision to vacate the judgment moots any questions concerning damages.

I

Sueann Ocrant called the Greenwood Village Police Department on May 20, 1984, to report that she had found the body of her husband, Lawrence Ocrant, in the master

---

[1] The plaintiffs' claims pursuant to Colorado law were asserted only against the individual defendants.

[2] Daryl G. Gates and Diane Sexton dismissed their appeal from the judgment on January 27, 1999.

bedroom of their home. He appeared to be dead.

Police Officer Nick Meneses of the Greenwood Village Police Department was the first policeman to arrive at the Ocrant residence. He observed a .32- caliber revolver in Mr. Ocrant's right hand. Daryl G. Gates, the Chief of Police of Greenwood Village,[3] arrived at the Ocrant residence five minutes after Officer Meneses. Detective Diane Sexton arrived at the home approximately one minute later. Detective Sexton took charge of the scene. When Ken Wilks, the deputy coroner arrived, he was told by Officer Meneses that Chief Gates had instructed him not to let anyone into the Ocrant residence. Mr. Wilkes was required to wait 20 to 30 minutes before he was allowed to see the body.

At Chief Gates's request, Sueann Ocrant was taken to the Swedish Medical Center before she was interrogated. Her hands were not tested for trace metal to determine whether she had fired a weapon. Chief Gates went to the hospital to interrogate Sueann Ocrant. He terminated his attempt to question her because she was distraught and incoherent. She was not interviewed until eight days after her husband's death. Later, on the same day that the body was discovered, Sueann Ocrant informed Chief Gates that there was a .25 caliber semi-automatic pistol in her home. She asked Chief Gates to remove it. Chief Gates retrieved the .25 caliber semi-automatic pistol. No suicide note was discovered in searching the Ocrant residence.

---

[3] Daryl G. Gates is not the same person who formerly served as the Chief of Police of the City of Los Angeles. The former Chief of Police of Los Angeles is Daryl F. Gates.

In the early part of 1984, Sueann Ocrant reported to Chief Gates on a number of occasions that she had been physically assaulted by her husband. During the latter part of April or the early part of May of 1984, Sueann Ocrant reported to Chief Gates and Detective Sexton that her husband had knocked her down the stairs and kicked her as she lay on the floor. She also revealed that her husband had threatened to kill her. Detective Sexton took a photograph of a bruise on Sueann Ocrant's right hip. Sueann Ocrant told Chief Gates that she did not want the police to take any action against her husband because she was concerned about her position in the community. On May 17, 1984, three days before Mr. Ocrant's death, Sueann Ocrant again informed Chief Gates that she had been physically assaulted by her husband.

The Plaintiffs are the son and daughter of Mr. Ocrant. Sueann Ocrant is their step-mother. On the day after Mr. Ocrant's body was discovered, Sara Stump noticed that Sueann Ocrant had a cut lip. Sueann Ocrant told Sara Stump that Mr. Ocrant had caused the injury.

No autopsy was performed on Mr. Ocrant's body. At Sueann Ocrant's request, his body was cremated on May 23, 1984. Mr. Ocrant was Jewish and observed the Hebrew traditions. Cremation was contrary to Mr. Ocrant's religious beliefs. No Ocrant family member had ever been cremated.

On June 1, 1984, Sueann Ocrant asked Chief Gates to destroy both of the weapons that had been taken from the Ocrant residence. Chief Gates informed the evidence

-5-

custodian that the guns could be destroyed because the cause of death was suicide. No ballistics tests were performed on the handguns. On July 26, 1984, Chief Gates, Detective Sexton, and the evidence custodian destroyed the handguns.

On August 2, 1984, the investigation was closed. Detective Sexton filed a report on that date stating Mr. Ocrant's fatal wound was self-inflicted.

As a result of citizen complaints regarding the police investigation of the cause of Mr. Ocrant's death, Deputy District Attorney David Heckenbush, a member of the Denver County District Attorney's Office, was appointed as a special Arapahoe County prosecutor to investigate the cause of Mr. Ocrant's death. The 1989 Araphoe County Grand Jury began its investigation in July of 1989. Detective Sexton and Sueann Ocrant testified before the grand jury. Chief Gates did not. He asserted his constitutional right not to incriminate himself.

The grand jury did not return an indictment. Instead, on December 14, 1989, it filed a sealed report in the Arapahoe County District Court. The report concluded that "the death of Larry Ocrant was a homicide and not a suicide as previously characterized by the Greenwood Village Police Department." On June 14, 1990, a state court judge ordered the disclosure to the plaintiffs of a single sentence from the grand jury's report that states that the cause of Mr. Ocrant's death was homicide.

The Plaintiffs filed this action in federal court on March 29, 1991 against the City, Chief Gates, Detective Sexton, Sueann Ocrant, and others. On August 9, 1991, the

district court ordered that the testimony of the witnesses before the 1989 Arapahoe Grand Jury be transcribed and released to the Plaintiffs. On October 8, 1991, the federal district court ordered the release to the Plaintiffs of the grand jury's report on its investigation regarding the death of Mr. Ocrant.

II

The theory of the Plaintiffs in this action is that the individual defendants' destruction of evidence denied them access to the state courts to assert a claim against Sueann Ocrant for the wrongful death of their father. The Plaintiffs did not attempt to file a civil action in state court for wrongful death, conspiracy, outrageous conduct, or for spoliation of evidence.

Prior to trial, the City filed a motion in limine to preclude the introduction of the grand jury report and information relating to the grand jury investigation. The motion was denied. The court admitted the grand jury report into evidence over objection, and allowed the special prosecutor to testify concerning his opinion regarding the motivation for Chief Gates's conduct. The City's motions for summary judgment and for judgment as a matter of law were denied by the district court.

The jury found in favor of the Plaintiffs on their claims against the City for interference with their right of access to the courts, and conspiracy to do so in violation of 42 U.S.C. § 1983. The jury awarded damages totaling $401,130 against the City.

III

In its opening brief, the City asserts, as its first ground for reversal, that the district court erred in denying its motion for summary judgment. The City argued before the district court that the evidence offered by the Plaintiffs was insufficient to show that (1) Chief Gates and Detective Sexton deliberately and egregiously destroyed material evidence in order to prevent the Plaintiffs from proving that suicide was not the cause of Mr. Ocrant's death; (2) the actions of Chief Gates and Detective Sexton rendered the plaintiffs' access to the court virtually meaningless; (3) the Plaintiffs would have been able to bring a claim for wrongful death in state court that would have survived a motion for summary judgment; and (4) Chief Gates, Detective Sexton, and Sueann Ocrant conspired to cover up the true cause of death. In arguing that the actions of Chief Gates and Detective Sexton did not render the Plaintiffs' access to the courts virtually meaningless, the City asserted that "[t]hey never even attempted to file a wrongful death claim."

The district court held that there were genuine issues of material fact in dispute regarding whether Chief Gates, Detective Sexton, and Sueann Ocrant "deliberately and egregiously interfered with -- and in effect prevented -- Plaintiffs' ability to pursue a course of action against the alleged killer," and whether they conspired to do so.

In its opening brief, the City argues that the district court erred in denying the motion for summary judgment on the Plaintiffs' denial of access to the court's claims because they did not attempt to bring a state court action for wrongful death before filing

this action in federal court. The City maintains that the fact that the Plaintiffs were able to present evidence at trial in support of their state-law claims of civil conspiracy and outrageous conduct demonstrates that access to the courts was not rendered virtually meaningless by the conduct of the individual defendants in destroying evidence of the cause of death. This argument is flawed in many respects. First, this court generally will not consider issues concerning the denial of a motion for summary judgment when they are raised for the first time on appeal. See Tele-comunications, Inc. v. Commissioner, 12 F.3d 1005, 1007 (10th Cir. 1993). The City did not argue before the district court that a plaintiff cannot demonstrate that access to a state court was futile or virtually meaningless without first attempting to file an action in state court.

Secondly, in reviewing an order denying a motion for summary judgment, we are limited to reviewing the evidence presented to the court at the time it ruled on the motion. See Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am., 935 F.2d 1152, 1156 n.3 (10th Cir. 1991). Therefore, we cannot consider the evidence adduced at trial in determining whether there were genuine issues of material fact in dispute requiring submission of the matter to a jury. We note, however, that the Plaintiffs' claim that the individual defendants' conduct in covering up the cause of death precluded the filing of a wrongful death action in state court is not refuted by proof of a conspiracy to cover up a crime or by evidence of outrageous conduct. To the contrary, evidence that the individual defendants were successful in covering up the cause of death demonstrates that an attempt to bring an

action in state court would have been futile.

Thirdly, the denial of a motion for summary judgment is not reviewable on an appeal following the entry of final judgment after a trial where the district court's decision on the motion was based on its determination that there were genuine issues of material fact in dispute. See Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1521 (10th Cir. 1997) (citing Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1250-51 (10th Cir. 1993)) "[E]ven if summary judgment was erroneously denied, the proper redress would not be through appeal of that denial but through subsequent motions for judgment as a matter of law . . . and appellate review if they were denied." Id. (quotations omitted). Accordingly, we cannot review the merits of the decision to deny the City's motion for summary judgment because its ruling was based on the district court's determination that there were genuine issues of fact in dispute.

After both sides rested, the City made an oral motion for a judgment as a matter of law pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure. The City argued that the fact that the Plaintiffs were able to present expert testimony regarding the cause of death conclusively proves that their right of access to the courts to prosecute a wrongful death claim was not rendered virtually meaningless. The district court denied the motion for judgment as a matter of law. It concluded that the evidence produced by the Plaintiffs was sufficient to require that the jury determine whether the destruction of evidence by the individual defendants before the completion of the investigation rendered

access to the courts to pursue a wrongful death claim virtually meaningless.

In its opening brief the City did not seek a reversal on the ground that the district court erred in denying the motion for judgment as a matter of law.[4]  In fact, the City's opening brief does not recite that fact that it made a motion for a judgment as a matter of law, nor does it contain a citation to Rule 50(a)(1).

For the first time in its reply brief, the City argues that it preserved the issue of the denial of access to the courts by addressing it in its motion for a judgment as a matter of law.  This court does not ordinarily review issues raised for the first time in a reply brief. See Headrick v. Rockwell Intern. Corp., 24 F.3d 1272, 1278 (10th Cir. 1994).  The reasons are obvious.  It robs the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result.  Id.  The rule also protects this court from publishing an erroneous opinion because we did not have the benefit of

---

[4]  Under the heading "Statement of Issues," the City set forth the issue regarding the legal sufficiency of the evidence as follows:

> A.  Whether the trial court erred in failing to grant the City's motion for summary judgment to dismiss as a matter of law plaintiffs' claim of 'denial of access to court' where plaintiffs had failed to attempt first to bring state tort claims in a state court action, and where plaintiffs brought and had successfully prosecuted state tort claims in the present action.

As discussed in the text, we cannot review the denial of a motion for a summary judgment after a trial on the merits where the district court ruled that there were genuine issues of material fact in dispute.

the appellee's response. Id. Because the City did not contest the denial of its motion for judgment as a matter of law in its opening brief, we decline to consider whether a plaintiff can demonstrate that access to state courts was futile or virtually meaningless without first attempting to file a claim in state court.

IV

The City also contends that the district court abused its discretion and deprived the City of its right to a fair trial when it denied its motion in limine to exclude the report of the 1989 Arapahoe County Grand Jury and admitted, over objection, evidence of the grand jury's investigation.

In its motion in limine, the City argued that the grand jury's report was a hearsay document that is untrustworthy because it was based upon the testimony of witnesses who had not been subjected to cross-examination. The City also asserted that the grand jury report was not relevant because it did not have a tendency to make the existence of any fact in dispute more probable. In addition, the City maintained that, even if relevant and admissible, evidence of the grand jury's investigation and report should have been excluded pursuant to Rule 403 of the Federal Rules of Evidence because its probative value was substantially outweighed by the danger of unfair prejudice to the City, and would mislead and confuse the jury.

The district court denied the motion in limine to exclude evidence of the grand

jury's investigation and report on the basis that it was not being offered for the truth of the matter, but to prove that "through the grand jury report, they learned that there had been a cover up of the death of their father and . . . the effect of this was to realize they had an outrageous conduct claim. They were outraged to discover this coverup." (emphasis added). The district court also ruled that this evidence was admissible "to show the effect on Greenwood Village after Greenwood Village found out about the report."

Rule 403 provides as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

We review a district court's ruling under Rule 403 for a clear abuse of discretion. See Deters v. Equipfax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir. 2000); Marshall v. El Paso Natural Gas Co., 874 F.2d 1373, 1380 (10th Cir. 1989). This court has held that the "unfair prejudice" standard in Rule 403 limits the use of relevant evidence that has "an undue tendency to suggest the jury make a decision on an improper basis, commonly, though not necessarily, an emotional one.". United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991) (quoting Fed. R. Evid. 403 advisory comm. n.).

The grand jury report reads as follows:

The 1989 Arapahoe County Grand Jury has investigated allegations surrounding the Death of Larry Ocrant on May 20, 1984, and hereby issues the following report concluding that the death of Larry Ocrant was a homicide and not a suicide as previously characterized by the Greenwood Village Police Department. The reasons for the determination that Larry Ocrant's death was a homicide and not suicide are as follows:

1. Although the exact cause of Mr. Ocrant's death can never be determined because no autopsy was performed, the apparent cause of death was a gunshot wound to the head. The entrance wound was a "non-contact" wound and was inflicted from a distance of several inches. The fact that the entrance wound was "non-contact" and was inflicted from a distance of several inches is indicative of a homicide rather than a suicide.

2. The physical position of Mr. Ocrant's body at the time of discovery is inconsistent with the bullet wounds having been self inflicted. Specifically, the position of Mr. Ocrant's head on top of his left arm, combined with the position of where the right hand and the gun were located, would indicate an extremely awkward position for Mr. Ocrant to have inflicted the gunshot wound himself.

3. Mr. Ocrant's body was found nude with the covers pulled up to his shoulders with the right leg drawn up as he lay on his side. This position is entirely consistent with a sleeping position and inconsistent with a posture for a self-inflicted gunshot wound.

4. There were two weapons kept in the household. The weapon that was found near Mr. Ocrant's hand after his death was one that was reportedly maintained in a locked desk in his office located at the opposite end of the house and down the stairs from the bedroom. Mr. Ocrant was an individual who wore glasses. The prospect of Mr. Ocrant's leaving the bedroom naked, without his glasses, proceeding to his office, retrieving the weapon from a locked desk drawer, returning to the bed, covering himself up and then inflicting a gunshot wound to himself is improbable and inconsistent with a suicide pattern of behavior.

5. The gun appears to have been placed near the right hand of the

-14-

victim.

6. Deputy Hopkins of the Arapahoe County Sheriff's Department conducted Trace Metal Detection Tests (TMDT) on Mr. Ocrant's hands. Although these tests were positive, Deputy Hopkins was not provided the gun which was found near Mr. Ocrant's body for comparison. In fact, Deputy Hopkins now concludes that the positive results of his TMDT tests are entirely inconsistent with Mr. Ocrant's having handled the particular weapon that was found near his body.

7. Some of the police officers who responded to the scene perceived that Mrs. Ocrant's grief was contrived and insincere.

8. Sueann Ocrant received in excess of $700,000 in insurance proceeds plus the equity in their home following Mr. Ocrant's death.

9. Prior to Mr. Ocrant's death, Sueann Ocrant reported incidents of physical abuse upon her by Mr. Ocrant to former Chief of Police, Daryl Gates.

10. Prior to Mr. Ocrant's death, Mrs. Ocrant became aware that Mr. Ocrant was suspicious of her behavior and had setup a recording device for her telephone calls. She also believed that Mr. Ocrant was having her followed by a private investigator.

11. Mr. Ocrant left no suicide note or other instructions with regard to his death.

Despite the finding that Larry Ocrant's death was a homicide, the Grand Jury is unable to return an indictment charging anyone with responsibility in his death because of the following:

1. Diane Sexton, who was the lead investigator at the scene of the Ocrant death, was totally ill-equipped and untrained to conduct any unattended death scene investigation.

2. Former Police Chief Daryl Gates interfered with the scene of the investigation and actively precluded the coroner's investigators from attending the scene of death for at least a 20-minute period of time.

3.  No one performed TMDT or gunpowder pattern tests on Sue Ocrant to determine whether or not she had fired a weapon.

4.  No ballistic tests were done on either gun found in the house or the bullet that was recovered from Mr. Ocrant's head.

5.  No autopsy was performed prior to cremation of the body of Larry Ocrant and toxicology tests were very limited.

6.  Police never questioned Sue Ocrant as a potential suspect regarding the circumstances surrounding her husband's death and instead provided her with comfort and console.

7.  The police never questioned the Ocrant children with regard to the circumstances surrounding their father's death.

8.  Police never conducted any neighborhood investigation in regard to the death.

9.  Former Chief Gates, although he knew of the past physical violence directed to Sue Ocrant by Larry Ocrant and knew about an incident in which Larry Ocrant reportedly held a gun to Sue Ocrant's head, always treated the investigation as a suicide and set the tone that mitigated against any homicide questioning or any homicide investigation.

10.  A glass found at the scene was never fingerprinted.

11.  Grocery bags found at the scene were never examined for a receipt that would indicate date and time of purchase.

12.  All physical evidence, including the two weapons that were found in the house were destroyed by special request of Sue Ocrant and under special supervision of former Chief Gates at the police garage. On the specific instruction of Chief Gates, the weapons were melted down, destroyed and rendered totally incapable of any ballistic tests in the future. This method of destruction was unique to the weapons involved in the Ocrant death which were destroyed July 26, 1984, prior to the final investigative report's being written.

-16-

\*

The Grand Jury hereby issues this report upon the vote of nine or more of its members.

                    /s/ Stephen Kaplan
                    Stephen Kaplan, Foreperson
                    1989 Arapahoe County Statutory
                    Grand Jury

\* 13.  If the statute of limitations had not run, the Grand Jury would have at a minimum issued an indictment charging Daryl Gates with Tampering with physical Evidence and Accessory after the fact - Homicide.  The Grand Jury further finds that Daryl Gates' refusal to testify before this grand jury further hampered their efforts to determine the responsibility for Larry Ocrant's homicide.[5]

In attempting to establish the probative value of the grand jury's investigation and report, the Plaintiffs argue that "[s]ave for Plaintiffs receiving the grand jury's report of this 1984 shooting, Plaintiffs may have never received any evidence to give them notice of their claims."  The record shows, however, that the Plaintiffs filed this action on  March 29, 1991.  The grand jury's report was not released to the Plaintiffs until October 8, 1991.  Their complaint, filed approximately seven months earlier, contained claims for denial of access to the courts  in violation of § 1983, plus state law claims for civil conspiracy and outrageous conduct.  Thus, contrary to the Plaintiffs' representation to the district court and this court, they had notice of their claims, and filed them months

---

[5]  The asterisks and paragraph 13 are in the special prosecutor's handwriting. They were added to the typewritten report at the request of the grand jury.

before the district court ordered the release of the grand jury's report. Thus, evidence of the grand jury's investigation and the release of its report had little, if any, probative value in establishing when or how the Plaintiffs received "notice of their claims."

The City's liability in this matter is based on the principle that a municipality is liable for the acts of a policymaker of the municipality. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-84 (1986). The City does not dispute that Chief Gates was a policymaker. Thus, the City may be held liable for Chief Gates's acts in directing the police investigation of Mr. Ocrant's death. Therefore, evidence improperly admitted against Chief Gates may also prejudice the right of the City to a fair trial.

The grand jury's report contains prejudicial statements regarding whether Chief Gates deliberately and egregiously covered up the cause of Mr. Ocrant's death in order to deny the Plaintiffs' access to the state court to maintain a wrongful death action against Sueann Ocrant. Perhaps the most devastating is the special prosecutor's handwritten statement that "[i]f the statute of limitations had not run, the Grand Jury would have at a minimum issued an indictment charging Daryl Gates with Tampering with physical Evidence and Accessory after the fact - Homicide." The special prosecutor also wrote that "Daryl Gates' refusal to testify before the Grand Jury further hampered their efforts to determine the responsibility for Larry Ocrant's homicide."

Submission of the evidence of the grand jury's conclusions created a high risk that the trial jury in this matter would be influenced by the fact that another group of private

citizens had previously concluded, after a formal grand jury investigation, that Chief Gates had intentionally destroyed evidence and that he was an accessory after the fact to a homicide. We further note that the introduction of the grand jury's report also risked misleading or confusing the trial jury as to whether the standard of proof that was applied by the grand jury in reaching its conclusion that Mr. Ocrant's death was a homicide and not a suicide, and that Chief Gates was an accessory after the fact to a homicide, was the same as the preponderance of the evidence standard.

The district court also permitted Special Prosecutor Heckenbush to testify that Chief Gates accorded Sueann Ocrant special treatment when he conducted the Ocrant investigation. Special Prosecutor Heckenbush was also permitted to testify that Chief Gates hampered the grand jury's investigation by exercising his privilege against self-incrimination. The probative value of this testimony was outweighed by its highly prejudicial effect.

The district court instructed the jury that it could consider the grand jury's report to determine its impact on the Plaintiffs. As discussed above, the contents of the grand jury report had minimal probative value, at best, because the Plaintiffs's claims were filed months before the report was released to them. We note also that the district court did not give a limiting instruction concerning the special prosecutor's testimony concerning the grand jury's investigation, or his opinion as to Chief Gates's motivation in conducting the investigation of the cause of Mr. Ocrant's death.

The district court abused its discretion in admitting evidence of the grand jury's investigation, including its report. Assuming arguendo that evidence of the manner or the date that the Plaintiffs first had notice of their claims against the City and the individual defendants was relevant or admissible, the court should have limited the Plaintiffs to the production of relevant or admissible evidence that led to the filing of their complaint on March 29, 1991. The probative value, if any, of the evidence of the grand jury's investigation and report to demonstrate the impact that they may have had on the Plaintiffs many months later was substantially outweighed by its prejudicial impact.

We have concluded that the court abused its discretion in admitting the grand jury's report and the prosecutor's testimony. We must next determine whether this error was harmless pursuant to Rule 61 of the Rules of Civil Procedure. The Plaintiffs sought damages against the City pursuant to § 1983 because of the conduct of Chief Gates in denying them access to the courts. To hold the City responsible, the Plaintiffs had to persuade the jury that Chief Gates, the City's policymaker in police activities, tampered with evidence regarding the cause of Mr. Ocrant's death or that he aided and abetted Sueann Ocrant in concealing evidence that she committed a homicide. It was the Plaintiffs' theory of the case that such conduct denied them the evidence necessary to pursue a wrongful death action against Sueann Ocrant in state court.

By admitting the grand jury's report and the testimony of the special prosecutor, the court permitted the Plaintiffs to present evidence that the grand jury believed that

there was sufficient proof to indict Chief Gates for tampering with physical evidence and aiding and abetting Sueann Ocrant after she committed a homicide. This striking condemnation of Chief Gates' conduct was added to the printed report in the special prosecutor's handwriting. Thus, it stood out boldly from the balance of the grand jury's report.

The grand jury's report also stated that "Chief Daryl Gates interfered with the scene of the investigation and actively precluded the coroner's investigators from attending the scene for at least a 20-minute period of time." In addition, the trial jury in this matter learned from the report that "[o]n the specific instruction of Chief Gates, the weapons were melted down, destroyed and rendered totally incapable of any ballistic tests in the future." The grand jury's report did not identify any percipient witness whose testimony supported these extremely damaging findings of fact and conclusions of law. The record also shows that the special prosecutor testified at trial that Chief Gates' exercise of his privilege against self incrimination hampered the grand jury's attempt to identify the perpetrator of the homicide.

In defining the term "unfair prejudice," the Advisory Committee's notes to Rule 403 explain that it refers to relevant evidence that has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Fed. R. Evid. 403 Advisory Comm. n. The Advisory Committee also states that a trial court should consider "[t]he availability of other means of proof" as an appropriate factor

reaching a conclusion whether to exclude evidence based on unfair prejudice. Id.

Some of the hearsay and conclusory allegations in the grand jury's report could have been proved by the testimony of percipient witnesses. The most damaging portions of the grand jury's report, however, concerning its finding that Chief Gates committed the crimes of tampering with evidence and accessory to a homicide were clearly inadmissible and prejudicial to the City's right to a fair trial. Under the unusual circumstances of this case, we are persuaded that permitting the trial jury to consider the impact of the findings of the Grand Jury and the special prosecutor's testimony on the Plaintiffs' decision regarding whether there remained sufficient evidence to pursue a wrongful death action in state court was not harmless error.

V

The City asserts that the district court erred in permitting the jury to award duplicative damages. In their cross appeal, the Plaintiffs contend that the court erred when it amended the judgment to provide that the City and the individual defendants were only severally liable for the amounts the jury had allocated. In light of our conclusion that we must reverse the judgment because the district court committed prejudicial error in admitting the results of the grand jury's investigation and report, we decline to consider the merits of the parties' contentions regarding the award of damages.

CONCLUSION

We reverse the judgment because we hold that the prejudicial effect of the

admission of the grand jury's report and the testimony of the special prosecutor substantially outweighed its probative value in that it permitted the trial jury to learn that the grand jury had found that Chief Gates had tampered with the evidence thereby making it impossible to prove the identity of the person who caused Mr. Ocrant's death. Since the Plaintiffs' denial of access to the court's claim was premised on persuading the jury that the City was liable for damages because Chief Gates' conduct precluded the Plaintiffs from filing a wrongful death action, the admission of this evidence was an abuse of discretion and was prejudicially harmful to the City's right to a fair trial.

We remand to the district court for a new trial. We express no view regarding whether the evidence that was properly admitted would support a finding of a denial of access to the courts.

The judgment is VACATED and REMANDED with directions.