FILED
United States Court of Appeals
Tenth Circuit

June 5, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

EARL LEE SNIDER;
CARMIN NOEL SNIDER,

       Plaintiffs-Appellants,

v.

LINCOLN COUNTY BOARD OF
COUNTY COMMISSIONERS, State
of Oklahoma; A.T. BRIXEY, Sheriff
of Lincoln County, Oklahoma;
DAVID NEAL; CHRIS EVANS,

       Defendants-Appellees.

No. 07-6196
(D.C. No. 05-cv-1367-M)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO** and **PORFILIO**, Circuit Judges, and **BRORBY**, Senior Circuit
Judge.

Earl Lee Snider and Carmen Noel Snider filed claims under 42 U.S.C.

§ 1983, alleging that David Neal and Chris Evans, both officers with the Lincoln

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

County Sheriff's Department, violated their Fourth and Fourteenth Amendment rights when, without a warrant, they entered the Sniders' home, seized Mr. and Mrs. Snider, and seized Mr. Snider's concealed weapon permit (CWP) and fifteen guns. The Sniders also alleged state-law claims for trespass, false arrest, false imprisonment, conversion, and replevin against the Lincoln County Board of County Commissioners (County) and respondeat superior claims against A.T. Brixey, the Sheriff of Lincoln County. Plaintiffs appeal the district court's grant of summary judgment in favor of the defendants on all claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## Background

The Sniders' claims relate to events that occurred on June 2, 2005, culminating in the removal of Mr. Snider's CWP and numerous firearms from their home by Sergeant Neal and Deputy Evans. There is no dispute that Mr. Snider had several peculiar encounters with the sheriff's department in the weeks leading up to June 2. He first reported to Neal that jewelry was missing from his house, but there was no sign of a forced entry. He ultimately had Mrs. Snider submit to a polygraph examination on June 1 regarding her involvement in the missing jewelry.[1] Mr. Snider also reported his suspicions that

---

[1]    Mr. Snider testified that Sergeant Neal suggested telling his wife and his adult stepdaughter that he was going to give them polygraph tests and that whoever refused to take the test was a possible suspect. Neal admits to

(continued...)

-2-

Mrs. Snider was drugging him and having an affair. He reported that someone was playing a trick on him by playing recordings of exotic birds outside of his house. He installed surveillance cameras and informed a deputy that he had a tape showing prowlers on his property. He reported finding footprints near the house, which he later claimed were Sergeant Neal's boot prints. He accused certain officers, including Neal, of being involved in a conspiracy with government agencies. And he told another deputy that the CIA was watching him and was in his attic.

As a result of Mr. Snider's various reports, a Captain in the sheriff's office asked Sergeant Neal to do a welfare check at the Sniders' residence on June 2. Neal explained that an officer may be asked to check on a person's well-being if there are possible physical or mental concerns. Before leaving the station, Neal conferred with other deputies who had taken reports from Mr. Snider. In addition to obtaining information about Mr. Snider's various reports, he learned that Mr. Snider had previously told another deputy that he had a CWP. Neal ran a database check on Mr. Snider that indicated he had no criminal history, but confirmed that he did have a CWP.

---

[1](...continued)
suggesting that Mr. Snider give his wife and stepdaughter polygraph tests, but he says that his comment was "off the cuff." Aplt. App., Vol. 2 at 365.

Deputy Evans accompanied Sergeant Neal to the Sniders' property. It is undisputed that they had no arrest or search warrant. They arrived about 5:00 p.m. and drove up the driveway through an open gate. Neal testified that they saw a shotgun inside of a shop building on the property through the open door to that building. The Sniders dispute that the door to the shop building was open. The officers knocked at the front door of the house. No one answered after several minutes and they were preparing to leave, when Mr. Snider tapped on a window to get their attention. He unlocked the door and stepped outside onto the porch at the officers' request. Sergeant Neal showed Mr. Snider his badge and introduced himself and Deputy Evans.

Neal testified that he asked Mr. Snider if he had his surveillance tapes and suggested that the officers come inside the house to view them. He said that he explained to Mr. Snider that they would need to secure his handgun for their own safety while inside the house. He testified that Mr. Snider consented to the officers entering the house and securing his handgun. But according to Mr. Snider's testimony, when Neal asked him for his surveillance tapes, he responded only that the tapes were not at the house and that he could make a phone call to have them returned. He denies that Neal ever asked for, or that he ever gave, permission for the officers to enter the house.

While they were on the porch, Neal asked to see Mr. Snider's driver's license and his CWP. He went inside the house, came back outside, and handed

-4-

these items to Neal, who examined them for a minute.  Neal also asked if Mrs. Snider could come outside too.  Mr. Snider returned inside and then both he and Mrs. Snider came out onto the porch.  At this point, Neal asked Mrs. Snider to step away from the porch with him and Deputy Evans and he told Mr. Snider to stay where he was.  Neal asked Mrs. Snider what was going on with her husband and she responded that, for various reasons, he was under a lot of stress.  She told the officers that she was not in fear for her life or safety.  Sergeant Neal told her that Mr. Snider "couldn't be calling around to different law enforcement agencies saying crazy stuff."  Aplt. App., Vol. 2 at 329.  She testified that Neal also told her "that he was there to get my husband's concealed weapons license and his concealed carry, or that he was going to–if he resisted in any type of way he was going to take him to jail and have a mental evaluation done on him."  *Id.* at 329-30.  Neal asked her if there were any more weapons other than the shotgun in the shop.  At that point, she began crying because she saw that the shop door had been opened.  When Mrs. Snider told Neal that there were more weapons, he said, "We're going to go in and you're going to point out where the weapons are, and you're not going to touch them and Mr. Evans is going to go with you and he's going to gather them up."  *Id.* at 336 (quotation omitted).

According to Mr. Snider, when Mrs. Snider and the officers moved back toward the porch they told him that they were going to come into his house, take every firearm in his possession and his CWP, and if he did not cooperate he

-5-

would be arrested and evaluated and his daughter would be taken away by the Department of Human Services (DHS). Mr. Snider testified that when he asked Neal what was the reason for this, Neal told him a neighbor had made a complaint, but did not identify which neighbor.

Mr. Snider testified that Sergeant Neal then escorted him and Mrs. Snider into the house. The officers immediately noticed two rifles on the kitchen table. Neal had Mr. Snider sit at the table and told him not to move. He told Mrs. Snider to go with Deputy Evans and point out all the firearms and not to reach for or grab any of them. Evans collected a total of fifteen guns, including two rifles and three handguns from the kitchen, several guns from the bedrooms located in a closet, laying on the beds, or in cases underneath the beds, and the shotgun from the shop building. All of the firearms but the shotgun were loaded and chambered. The officers filled out a sheriff's department form listing the items seized and had Mr. Snider sign it. At the Sniders' request, they provided and signed a second, itemized property receipt. Mrs. Snider assisted Deputy Evans in putting the guns into the trunk of the squad car. She testified that a neighbor witnessed her doing so. Neal and Evans were at the Sniders' house for almost two hours.

While Mr. Snider was sitting in the kitchen with Sergeant Neal, his four-year-old daughter walked up to him near where one of the loaded guns had been. He asked Neal if he could put a movie on in the bedroom for her, but Neal

-6-

told him to stay where he was and to let his wife attend to the child. Neal testified that he was not aware of the child until she walked into the kitchen.

Neal also testified, contrary to Mr. Snider's testimony, that Mr. Snider did not discover that he did not have the surveillance tapes until after they came inside the house. While sitting at the table, Mr. Snider called his friend who had the tapes and the friend's sister brought them over while the officers were still at the Sniders' house. After all of the guns had been gathered up, Mr. Snider asked them if they were going to watch the surveillance tapes, because "that's why you said you was initially here?" *Id.*, Vol. 1 at 154 (quotation omitted). He said that Neal then acted really interested in the tapes. They watched for five or ten minutes and then Neal and Evans left the Sniders' house.

The Sniders testified that Sergeant Neal gave Mr. Snider a two-week ultimatum to go see a psychiatrist, and if he failed to do so, Neal would be back to incarcerate him for being mentally unstable. Mr. Snider said that Neal told him he could get the weapons back if he saw a psychiatrist and that Neal also made a statement about Mr. Snider losing his CWP if he was taken in on an Emergency Order of Detention (EOD). Mr. Snider explained that he agreed to let the officers take the guns because they said that he would be arrested and his daughter would be taken from him.

Mr. Snider asserted that he didn't know what was going on before the officers started telling him what to do. He testified, "I was pretty much told what

to do, how to do it. . . . And not to move." *Id.*, Vol. 2 at 318. He testified that he was under duress: "I was in shock and disbelief. . . . He had a badge. He had a gun. What was I to do? I'm not, I'm not sophisticated in law." *Id.*, Vol. 1 at 153, 158. Mrs. Snider testified that the officers came into her house, did what they wanted to do, and told her and Mr. Snider what to do. Mr. Snider admitted that he did not refuse to talk to the deputies on his front porch and that he could have shut the door on them after he went back into the house. Mrs. Snider admitted that she did not refuse to assist Deputy Evans in collecting the guns, nor did she try to leave.[2] There is no evidence that Neal or Evans ever touched the plaintiffs, drew a weapon, or otherwise threatened them with physical force. Neither plaintiff told the officers that they were trespassing or asked them to leave. Nor did they demand an arrest or a search warrant.

Neal testified that he initially only intended to secure the weapons for the officers' own safety inside the house, but decided that they needed to remove the weapons once they became aware of the four-year-old child in the house with all the loaded guns. At that point, he decided that one option was to seek an EOD on Mr. Snider and he believed that he had probable cause to do so. He had no information that Mr. Snider had ever threatened anyone with harm. But he testified that, in his opinion, Mr. Snider's mental state created a situation where

---

[2]    At one point during the encounter, Mrs. Snider went outside by herself to look for her cell phone in her truck, yet she did not drive away.

he might be a danger to himself or others. He also believed that a call to DHS would be appropriate because the loaded weapons placed throughout the house were a danger to the Sniders' child. According to Neal, however, the downside of an EOD was that Mr. Snider would permanently lose his CWP and it could also affect his livelihood. He testified that he thought that Mr. Snider's current state of stress was temporary and that there would be a point at which he could get his CWP back, and he wanted to provide Mr. Snider with that opportunity. Neal anticipated getting a letter from Mr. Snider's doctor, indicating it was okay for him to have the guns. He testified that he took Mr. Snider's CWP and the firearms only for safekeeping, and that at no time did he intend to deprive Mr. Snider of his permit or the guns. Defendants contend that the Sniders consented to the officers taking their property as an alternative to Mr. Snider being taken into custody on an EOD and a call to DHS.

After they removed the guns and Mr. Snider's CWP from the Sniders' house, Sergeant Neal placed them in the property room in the sheriff's department. He ran a database check and determined that none of the weapons was stolen or had been involved in a crime. He also discussed the situation with the district attorney the same evening. The next day Neal called Mr. Snider to verify that he had made an appointment with a doctor, but Mr. Snider responded that his lawyer would contact Neal. Mr. Snider did not go to see a psychiatrist. Instead, he contacted his lawyer the following day for assistance in getting his

guns and CWP back and he filed this lawsuit in November 2005. He also subsequently purchased two new guns. The firearms taken from the Sniders' house and Mr. Snider's CWP remain in the property room in the sheriff's department. Neal testified that he has no authority to return the weapons and that Mr. Snider would have to go through the district attorney's office to get them back.

**Procedural History**

The district court granted summary judgment in favor of defendants on all of plaintiffs' claims. It concluded that defendants are immune from liability on the state-law tort claims under the Oklahoma Governmental Tort Claims Act (GTCA), Okla. Stat. tit. 51, §§ 151-200. It held that the Fourteenth Amendment was inapplicable to the Sniders' claims because the rights allegedly violated are protected by the Fourth Amendment. And it concluded that Neal and Evans were entitled to qualified immunity on the Fourth Amendment claims. The district court subsequently denied plaintiffs' motion for reconsideration under Federal Rule of Civil Procedure 59(e).

**Summary Judgment Standard of Review**

Our review of a district court's grant of summary judgment is de novo. *Clark v. Edmunds*, 513 F.3d 1219, 1221 (10th Cir. 2008). In conducting our review we consider the evidence in the light most favorable to the nonmoving party. *Id.* at 1221-22. Summary judgment is warranted "if the pleadings, the

-10-

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## Section 1983

## Fourth Amendment Claims

Neal and Evans asserted in their summary judgment motion that their entire encounter with plaintiffs was consensual and therefore they were entitled to qualified immunity. The district court concluded that the Sniders were not seized, but that even if they were, any such seizure was reasonable. It granted summary judgment in favor of Evans and Neal on all of plaintiffs' § 1983 claims, without discussing their claims related to the officers' entry of their home and seizure of their property. Based on its recitation of the facts, it appears that the court concluded that those actions were consensual.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. The Fourth Amendment's protections apply in a civil context. *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004). The "chief evil against which the Fourth Amendment is directed" is "the warrantless entry of the home." *United States v. Lowe*, 999 F.2d 448, 451 (10th Cir. 1993) (quotation and alteration omitted). But voluntary consent is an exception to the warrant requirement. *Id.*

The validity of a consent-based search is based upon the totality of the circumstances as to whether the consent was the product of an essentially free and unconstrained choice by the maker or whether it was the product of duress or coercion, express or implied. Relevant circumstances include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons.

*Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir. 2008) (quotations and citation omitted). "The central question is whether a reasonable person would believe he was free to leave or disregard the officer's request." *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quotation omitted).

A consensual encounter also does not amount to a "seizure" of a person. *United States v. Spence*, 397 F.3d 1280, 1282 (10th Cir. 2005). "A seizure occurs only when an officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen." *Id.* at 1283. Whether a person has been seized again turns on a consideration of "all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* (quotation omitted). Relevant factors include:

the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long

-12-

the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Id.* (quotation omitted).

The Sniders argue on appeal that the district court erred in granting summary judgment on their Fourth Amendment claims because material facts are in dispute regarding whether they were seized and whether they voluntarily consented to the officers entering their home and taking away their property. Initially, we agree with plaintiffs that the district court failed to consider the evidence in the light most favorable to them. As our summary of the evidence shows, the parties presented different versions of what occurred at the Sniders' home on June 2, 2005, yet the district court recited the facts in the light most favorable to defendants, disregarding much of the Sniders' testimony offered in opposition to the summary judgment motions. But identifying this error does not alone entitle plaintiffs to relief because they have not even attempted to satisfy their burden to establish that, when properly viewed in the light most favorable to them, the evidence shows that Neal and Evans violated a clearly established constitutional right. Therefore we affirm on this alternative ground. *See B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 666 n.15 (10th Cir. 2006) (noting appellate court may affirm on grounds not relied upon by the district court).

-13-

In the district court, and again on appeal, the Sniders fail to acknowledge their "heavy two-part burden" in opposing a summary judgment motion asserting qualified immunity. *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007) (quotation omitted). "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Eidson*, 515 F.3d at 1145 (quotation omitted). "[Q]ualified immunity is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial. . . ." *Clark*, 513 F.3d at 1222 (quotation omitted). Therefore, a plaintiff's burden in opposing a motion based on qualified immunity is greater than for other summary judgment motions:

> When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test: first, the plaintiff must show that the defendant's actions violated a constitutional or statutory right; second, the plaintiff must show that this right was clearly established at the time of the conduct at issue.

*Id.* (quotations omitted).

The Sniders were required to demonstrate why their evidence satisfied this strict two-part test. Rather than doing so, they assert instead that the government bears the burden in this case to show that their consents were voluntary. Aplt.

-14-

Opening Br. at 13-19, 40-41; Aplt. Reply Br. at 4-6.[3]  And they argue that summary judgment was improperly granted because material facts are in dispute. But a defendant asserting qualified immunity takes on the traditional summary judgment burden "if and only if, the plaintiff meets [the] two-part test." *Clark*, 513 F.3d at 1222 (quotation omitted).

The Sniders make no attempt to satisfy their heavy burden.  They do not analyze the various factors relevant to whether a reasonable person under their circumstances would have felt free to terminate their encounter with Neal and Evans.  They do not cite any case law supporting a conclusion that, based on the evidence of the circumstances as a whole viewed in the light most favorable to them, their cooperation with the officers was coerced rather than voluntary.  Nor do they cite a single case demonstrating that a reasonable officer in those circumstances would have known he was violating their constitutional rights.  *See Eidson*, 515 F.3d at 1148 ("[T]here must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." (quotation omitted)). Their unsupported suggestion that the legal rules governing the officers' behavior

---

[3]     For this proposition plaintiffs rely on cases in the criminal context where, in response to a motion to suppress evidence obtained in violation of a constitutional right, the government does indeed bear the burden of justifying a warrantless arrest or search. *See United States v. Abdenbi*, 361 F.3d 1282, 1287 (10th Cir. 2004) (addressing consent exception).

have long been clearly established, and their citation to authorities holding that warrantless searches and seizures are presumptively unreasonable, do not come close to satisfying their burden. *See id.* (noting plaintiff must cite case law "sufficiently analogous to satisfy the particularized context necessary to support liability" (quotation omitted)); *Mecham*, 500 F.3d at 1205-06 ("This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (quotation omitted)).

It is not the province of this court to support an appellant's position with legal argument and authority. *See Phillips v. Calhoun*, 956 F.2d 949, 953 (10th Cir. 1992) (declining to consider issue not even minimally supported by legal argument and authority). Therefore, because plaintiffs both misconstrue their burden in opposing summary judgment based on qualified immunity, and have made no attempt to satisfy it, we affirm the district court's grant of summary judgment in favor of Neal and Evans on their Fourth Amendment claims.

## Fourteenth Amendment Claim

Plaintiffs argue that the district court erred in concluding that the Fourteenth Amendment is inapplicable to their claims. In reaching this conclusion, the district court reasoned that the rights allegedly violated are explicitly protected by the Fourth Amendment. The court relied on *Graham v. Connor*, 490 U.S. 386 (1989), which held that an excessive force arrest claim should be analyzed under the Fourth Amendment, rather than "the more

-16-

generalized notion of 'substantive due process'" in the Fourteenth Amendment. *Id.* at 395.  But the Supreme Court distinguished *Graham* in *Soldal v. Cook County*, 506 U.S. 56 (1992), observing that "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands.  Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character.  Rather, we examine each constitutional provision in turn." *Id.* at 70.

Here, plaintiffs alleged violations of their Fourteenth Amendment due process rights in addition to their right to be free from unreasonable searches and seizures under the Fourth Amendment.  Although much of their argument in support of their due process claim relates to the propriety of the officers' initial seizure of the guns and Mr. Snider's CWP, they do address as well the detention of their property for several years, without a hearing.  They refer specifically to the failure to follow the established procedures for revocation of a CWP under Oklahoma state law.

To the extent the Sniders allege a procedural due process violation related to the continued retention of their property, as opposed to the initial seizure, the district court erred in concluding that their claim only raised rights explicitly protected by the Fourth Amendment.  As the Supreme Court has noted, "A seizure is a single act, and not a continuous fact." *California v. Hodari D.*, 499 U.S. 621, 625 (1991) (quotation omitted).  Following a seizure there is an obligation "to

-17-

provide fair procedures to ensure return of the property when the State no longer has a lawful right to retain it," the extent of which the Supreme Court considered in *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999); *see also Davis v. Gracey*, 111 F.3d 1472, 1477 (10th Cir. 1997) ("A failure to timely to return seized material which is without evidentiary value and which is not subject to forfeiture may state a constitutional or statutory claim.").

In a similar factual context, involving both the seizure and detention of personal property, we analyzed the propriety of the initial seizure by police under the Fourth Amendment, but held that the ultimate disposition of the property had to comply with the protections of procedural due process. *See Winters v. Bd. of County Comm'rs*, 4 F.3d 848, 853, 856 (10th Cir. 1993); *cf. Kripp v. Luton*, 466 F.3d 1171, 1173 (10th Cir. 2006) (distinguishing Fourth Amendment claim regarding illegal search and seizure from claim alleging deprivation of property in forfeiture process, which was "essentially a Fifth Amendment due process claim"). Other circuits have followed the same approach with respect to alleged constitutional violations related to the seizure versus the detention of property. *See Shaul v. Cherry Valley-Springfield Cent. High Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004) (holding claim related to government's retention of property after seizure raised due process rather than unreasonable seizure claim); *Porter v. DiBlasio*, 93 F.3d 301, 304, 306 (7th Cir. 1996) (analyzing procedural due process claims related to termination of rights in seized horses); *Lindsey v.*

*Storey*, 936 F.2d 554, 561 & n.9 (11th Cir. 1991) (analyzing seizure claim under Fourth Amendment separately from procedural due process claim regarding continued retention of personal property).

Although we conclude that the district court's basis for dismissing the Snider's Fourteenth Amendment claim was in error, we again affirm its decision on other grounds. Plaintiffs brought their § 1983 claims only against Neal and Evans, yet they presented no evidence that either of these individuals had authority to return their property once it was seized. In fact, Neal testified that he has no such authority.[4] Therefore, we affirm the district court's grant of summary judgment on plaintiffs' Fourteenth Amendment due process claim related to the detention of the property. *See Davis*, 111 F.3d at 1477 (declining to address potential violation of rights from failure or delay in returning seized materials where plaintiffs failed to allege officer defendants had authority to return the materials).

---

[4] Plaintiffs emphasize that their property is still in the physical possession of Sheriff Brixey, but even if that means he has the authority to return it, they failed to assert their § 1983 Fourteenth Amendment claim against him. Although they state in their opening appellate brief that they alleged a claim against Brixey under § 1983 for detention of their personal property without due process, in their complaint they named only Neal and Evans on that claim. And in their opposition to Brixey's summary judgment motion, they stated explicitly that their § 1983 claims were brought solely against Neal and Evans.

## State-Law Claims

## The County

The district court concluded that the County is immune from liability for plaintiffs' state-law tort claims under the GTCA. Specifically, it relied on an exemption from liability in the Act which provides, in relevant part: "The state or a political subdivision shall not be liable if a loss or claim results from: . . . the failure to provide, or the method of providing, police, law enforcement or fire protection." Okla. Stat. tit. 51, § 155(6). Plaintiffs argue that the district court erred in holding that the County was immune from liability under this section, and that material facts are in dispute regarding whether the deputies were engaged in providing police or law enforcement "protection" to them.

Our review of the district court's interpretation of Oklahoma law is de novo. *Cooper v. Cent. & Sw. Servs.*, 271 F.3d 1247, 1251 (10th Cir. 2001). We must "ascertain and apply Oklahoma law with the objective that the result obtained in federal court should be the result that would be reached in an Oklahoma court. In so doing, we must apply the most recent statement of state law by the state's highest court." *Id.* (citation and quotations omitted).

In *Salazar v. City of Oklahoma City*, 976 P.2d 1056 (Okla. 1999), the Oklahoma Supreme Court noted that under the GTCA, and subject to specific limited exceptions, a political subdivision is liable for all torts committed by its employees acting in the scope of their employment to the same extent that a

-20-

private person or entity would be liable. *Id.* at 1066 & n.49 (interpreting Okla. Stat. tit. 50, § 153). Section 155 of the GTCA prescribes "thirty carefully circumscribed exemptions," including the exemption concerning "police, law enforcement or fire protection" in § 155(6) *Id.* at 1066 (alteration omitted). But the Oklahoma Supreme Court has rejected the conclusion that this exemption from liability applies to all police/law enforcement functions. *Schmidt v. Grady County*, 943 P.2d 595, 597 (Okla. 1997). The court instead reasoned that:

> "[p]rotection" serves as the key word for the textual analysis of the critical sentence quoted here from subsection 6. The exemption in that subsection is invocable when the tort arises while a municipality is rendering services that fall into some category of *police protection, law enforcement protection* or *fire protection*. In short, a governmental subdivision is not *liable for deficiency of protective services extended by the police, law enforcement or fire fighting components*.

*Salazar*, 976 P.2d at 1066.

The Sniders argue that the County's immunity for claims resulting from police or law enforcement "protection" applies only in the very narrow context of injuries occurring while officers are taking a person into protective custody. We disagree. In interpreting § 155(6), the Oklahoma Supreme Court has focused on the "relationship" of the municipality to the plaintiff as a result of the function being provided, rather than the particular action resulting in injury. *See Schmidt*, 943 P.2d at 598. Thus, a municipality was immune from liability for fire damage to a home after a fire hydrant malfunctioned because "the relationship to the

plaintiffs was as a municipality carrying out a fire protection function." *Id.* (citing *Shockey v. City of Okla. City*, 632 P.2d 406, 408 (Okla. 1981)). And the court held in *Schmidt* that an officer was providing "police protection" to a plaintiff who was injured while being taken into protective custody, after describing the officer's function in that case as "protect[ing] her from harming herself or others and from being harmed by others." *Id.* at 598, 596. In contrast, an officer who, within the scope of his employment, negligently injures an innocent bystander with his vehicle is not engaged in providing police protection *to that person*. *See id.* at 598.

The court further contrasted the roles of "protector" and "law enforcer" in *Salazar*, 976 P.2d at 1065, defining the latter function to include police "actions incident to arrest or imprisonment," *id.* at 1066, and specifically distinguishing "a person in need of protection from harming herself or others" from "an arrestee," *id.* at 1067 (emphasis omitted). Thus, "[r]ather than carrying out a law enforcement function, the officer in *Schmidt* was protecting a woman from the consequences of her disturbed mental state." *Id.* (emphasis omitted). In contrast, a municipality is not immune from liability under § 155(6) when it is carrying out law enforcement duties, for example, by negligently failing to provide adequate medical care to an arrestee, *id.* (citing *Pritchard v. City of Okla. City*, 975 P.2d 914 (Okla. 1999), or for the negligent arrest and detention alleged in *Salazar*, *id.* at 1068.

Plaintiffs argue nonetheless that material facts are in dispute regarding whether the County was providing protective services to them. But there is no dispute that Sergeant Neal and Deputy Evans were sent to the Sniders' house on a welfare check, out of a concern for Mrs. Snider's safety and Mr. Snider's mental state, based upon his recent, peculiar reports to the sheriff's department. Plaintiffs draw our attention to their evidence that Neal told Mr. Snider that the officers were responding to a complaint from a neighbor, but there is no evidence that the complaint related to any crime or that the deputies came to his house as "law enforcers" to arrest him for a criminal offense. Plaintiffs do not dispute that Deputy Neal also told Mr. Snider that he could be subject to an EOD. That the officers ultimately did not take him into protective custody does not alter the County's relationship to the Sniders as "protective." Therefore, the district court did not err in granting the County summary judgment on their state-law tort claims under the exemption from liability in § 155(6).

## Sheriff Brixey

Plaintiffs' claims against Sheriff Brixey were premised on a respondeat superior theory of liability, based upon a statute that provides in relevant part that "[t]he sheriff shall be responsible for the official acts of the undersheriff and deputy sheriffs." Okla. Stat. tit. 19, § 547. In his summary judgment motion, Brixey argued that § 547 has been abrogated by the exclusive remedy under the GTCA. The district court did not reach this issue, but instead granted Brixey

-23-

summary judgment, finding that he had no respondeat superior liability based upon the court's previous finding that Neal and Evans were not liable to plaintiffs on any of their claims. On appeal, the Sniders not only do not raise any claim of error regarding the district court's basis for granting summary judgment to Brixey, they explicitly decline to address it. Therefore, we affirm the district court's grant of summary judgment to Sheriff Brixey.

## Replevin Claim

The district court held that the Sniders' replevin claim sounded in tort, and therefore was properly dismissed along with their other state-law tort claims under the GTCA. In their opening appellate brief, they take no issue with the district court's determination that their replevin claim is a tort claim, but they assert without further explication, "Once having made a determination that in our case the Replevin action sounded in Tort, and that the GTCA applied, and there being no exemption in the statute, the Court erred in not issuing its Order of Replevin." Aplt. Opening Br. at 38. We interpret their statement "there being no exemption in the statute" to relate back to their argument that the County is not exempt from liability for their tort claims under the GTCA. We have already rejected that contention. And we have affirmed the district court's grant of summary judgment to Sheriff Brixey on other grounds.[5]

---

[5] We decline to consider a statutory-construction argument regarding an
(continued...)

Therefore, we affirm the district court's grant of summary judgment in favor of defendants on all of plaintiffs' state-law claims.

The judgment of the district court is AFFIRMED.

Entered for the Court


John C. Porfilio
Circuit Judge

[5](...continued)
amendment to the replevin statute that plaintiffs waived by failing to present it in the district court and raising it for the first time in their reply brief on appeal. *See Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 798-99 (10th Cir.) (declining to consider new theory on appeal), *amended on other grounds*, 103 F.3d 80 (10th Cir. 1996); *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (raising issue for first time in reply brief "robs the appellee of the opportunity . . . to present an analysis of the pertinent legal precedent that may compel a contrary result").